# Exhibit J



Quint & Thimmig LLP

2010-08778
Recorded at the request of:
FIDELITY NATIONAL TITLE
07/07/2010 09:36 AM
Fee: $178.00  Pgs: 1 of 56
OFFICIAL RECORDS
Susan M. Ranochak - Clerk-Recorder
Mendocino County, CA

AFTER RECORDATION PLEASE RETURN TO:

Quint & Thimmig LLP
575 Market Street, Suite 3600
San Francisco CA 94105-2874
Attention: Brian D. Quint, Esq.

---

# AMENDED AND RESTATED REGULATORY AGREEMENT

## STATE OF CALIFORNIA
### OFFICE OF STATEWIDE HEALTH PLANNING AND DEVELOPMENT
### HEALTH FACILITY CONSTRUCTION LOAN INSURANCE

| | |
|---|---|
| Dated as of: | July 1, 2010 |
| Office Loan (8/1996) No.: | 0564 |
| Office Loan (10/2009) No.: | 0929 |
| Office Loan (3/2010) No.: | 0944 |
| Office Loan (7/2010) No.: | 0945 |
| Amount of 1996 Bonds: | $4,030,000 |
| Amount of 2009 Bonds: | $5,000,000 |
| Amount of 2010 Insured Line of Credit: | $1,000,000 |
| Amount of 2010 Bonds: | $2,875,000 |
| District: | Mendocino Coast Health Care District |
| Trustee: | The Bank of New York Mellon Trust Company, N.A. |
| Date of 1996 Bonds: | August 1, 1996 |
| Date of 2009 Bonds: | October 14, 2009 |
| Date of 2010 Insured Line of Credit: | March 1, 2010 |
| Date of 2010 Bonds: | July 8, 2010 |
| Deeds of Trust Recorded in: | Mendocino County, State of California |
| Date Deeds of Trust Recorded: | August 27, 1996, October 13, 2009, April 20, 2010 and July 7, 2010 |
| Regulatory Agreement Recorded in: | Mendocino County, State of California |
| Date Regulatory Agreement Recorded: | July 7, 2010 |
| Title Insurance Policy Issuer: | Chicago Title Insurance Company |
| 1996 Title Insurance Policy Number: | 16264-NB4 |
| 2009 Title Insurance Policy Number: | CACTI 7734-7734-2311-0235101623-2009-14 |
| 2010 Title Insurance Policy Number: | CACT17734-7734-2311-0235101957-CTIC-2010-14 |
| District's Fiscal Year: | From July 1 to June 30 |
| Type of Facilities: | District Hospital |
| 1996 Project: | To refund the District's Insured Health Facilities Revenue Bonds, Series 1990A, issued to finance the acquisition, construction, improvement and equipping of certain health care facilities of the District |
| 2009 Project: | To finance the acquisition, construction, improvement and equipping of certain health care facilities of the District |
| 3/2010 Project: | To secure a Line of Credit |
| 7/2010 Project: | To (a) finance certain central plant improvements at its acute care hospital facility located in Fort Bragg, California, and to reimburse the District for costs thereof previously made, including but not limited to any or all expenses incidental thereto or connected therewith, (b) finance certain SB 1953-mandated earthquake retrofit improvements to the District's health care facilities, and (c) to finance additional improvements to the District's health care facilities |

13049.01

TABLE OF CONTENTS

SECTION I.         DEFINITIONS.................................................................................................................2
SECTION II.        GENERAL COVENANTS.............................................................................................11
SECTION III.       NEGATIVE COVENANTS............................................................................................14
SECTION IV.       MAINTENANCE OF THE FACILITIES ....................................................................15
SECTION V.        BANKRUPTCY; INSOLVENCY; RECEIVER...........................................................15
SECTION VI.       MAINTENANCE OF EXISTENCE; AFFILIATION, MERGER,
                  CONSOLIDATION, SALE OR TRANSFER UNDER CERTAIN
                  CONDITIONS................................................................................................................15
SECTION VII.      RATES AND CHARGES; DEBT COVERAGE; CURRENT RATIO; DAYS
                  CASH ON HAND ..........................................................................................................17
SECTION VIII.     LIMITATION ON ENCUMBRANCES .......................................................................18
SECTION IX.       LIMITATION ON INDEBTEDNESS ..........................................................................18
SECTION X.        LIMITATIONS ON DISPOSITION OF PROPERTY...................................................21
SECTION XI.       LIMITATION ON ACQUISITION OF PROPERTY, PLANT AND
                  EQUIPMENT.................................................................................................................22
SECTION XII.      PARITY DEBT ..............................................................................................................22
SECTION XIII.     COMPLIANCE WITH LAW; MAINTENANCE OF FACILITIES.............................22
SECTION XIV.      TAXES, ASSESSMENTS AND GOVERNMENTAL CHARGES................................23
SECTION XV.       INSURANCE...................................................................................................................23
SECTION XVI.      WORKERS' COMPENSATION AND INSURANCE LAW ........................................26
SECTION XVII.     INSURERS; POLICY FORMS AND LOSS PAYEES..................................................26
SECTION XVIII.    TITLE INSURANCE.......................................................................................................26
SECTION XIX.      DISPOSITION OF INSURANCE AND CONDEMNATION PROCEEDS ................27
SECTION XX.       OPERATION OF THE FACILITIES...............................................................................28
SECTION XXI.      REMEDIES UPON DEFAULT.......................................................................................30
SECTION XXII.     NO DISCRIMINATION ...............................................................................................33
SECTION XXIII.    FINANCIAL STATEMENTS ........................................................................................33
SECTION XXIV.     CAPITAL REPLACEMENT FUND...............................................................................33
SECTION XXV.      DEBT COVERAGE RATIO REPORTING.....................................................................34
SECTION XXVI.     ENVIRONMENTAL DISCLOSURE AND INSPECTION............................................34
SECTION XXVII.    NOTICE OF DEFAULT..................................................................................................35
SECTION XXVIII.   CANCELLATION OF INSURANCE..............................................................................35
SECTION XXIX.     OFFICE CONSENT DISCRETIONARY.........................................................................36
SECTION XXX.      CONTRARY AGREEMENTS SUPERSEDED ..............................................................36
SECTION XXXI.     SPECIFIC PERFORMANCE ..........................................................................................36
SECTION XXXII.    WAIVER OF PERSONAL LIABILITY...........................................................................36
SECTION XXXIII.   NOTICES ........................................................................................................................36
SECTION XXXIV.    SUCCESSORS BOUND ..................................................................................................37
SECTION XXXV.     SEVERABILITY OF INVALID PROVISIONS ..............................................................37
SECTION XXXVI.    AGREEMENT REPRESENTS COMPLETE AGREEMENT;
                  AMENDMENTS ............................................................................................................37
SECTION XXXVII.   HEADINGS AND REFERENCES...................................................................................37
SECTION XXXVIII.  GOVERNING LAW; VENUE.........................................................................................38
SECTION XXXIX.    ATTORNEYS' FEES.......................................................................................................38
SECTION XL.       EXECUTION IN COUNTERPARTS...............................................................................39

EXHIBIT A:        REAL PROPERTY DESCRIPTION
EXHIBIT B:        PERSONAL PROPERTY DESCRIPTION
EXHIBIT C:        ENVIRONMENTAL INDEMNITY
EXHIBIT D:        EXISTING LIENS AND ENCUMBRANCES
EXHIBIT E:        COLLATERAL PLEDGED

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 3 of
57

# REGULATORY AGREEMENT

This REGULATORY AGREEMENT ("Regulatory Agreement"), dated as of the date set forth on the cover hereof, and effective as of July 8, 2010, is by and between the District set forth on the cover hereof, a local healthcare district of the State of California ("District"), and the Office of Statewide Health Planning and Development of the State of California ("Office"), amending, supplementing and restating that certain regulatory agreement, dated as of October 1, 2009, between the District and the Office, recorded in the official records of Mendocino County, State of California, on October 14, 2009, as Instrument No. 2009-15802 (the "2009 Regulatory Agreement"), as amended by that certain First Amendment to Amended and Restated Regulatory Agreement, dated as of March 1, 2010, between the District and the Office (the "First Amendment to 2009 Regulatory Agreement").

WHEREAS, the Office is authorized to enter into this Regulatory Agreement pursuant to California Health and Safety Code sections 127045 and 129105;

WHEREAS, the Director of the Office is authorized to enter into this Regulatory Agreement on behalf of the Office pursuant to California Health and Safety Code section 127010 and California Government Code section 11150, *et seq.*;

WHEREAS, the undersigned Deputy Director of the Office was appointed by the Director of the Office to act on the Director's behalf pursuant to Delegation Order 08-02, effective March 11, 2008, and is so authorized by California Health and Safety Code Section 7 and California Government Code Sections 1194, 7 and 18572;

WHEREAS, the District is authorized to enter into this Regulatory Agreement pursuant to the District's resolution dated May 27 2010;

WHEREAS, the District and the Office entered into the 2009 Regulatory Agreement in connection with the insurance by the Office of the 2009 Bonds (hereinafter defined);

WHEREAS, the District and the Office entered into the First Amendment to 2009 Regulatory Agreement in connection with the insurance by the Office of the 2010 Line of Credit (hereinafter defined); and

WHEREAS, the District has requested that the Office insure the 2010 Bonds (hereinafter defined) and the Office has agreed to so insure the 2010 Bonds with one of the conditions being the amendment, supplementation and restatement of the 2009 Regulatory Agreement and the First Amendment to 2009 Regulatory Agreement;

NOW, THEREFORE, in consideration of the insurance by the Office of the Bonds (hereinafter defined), the proceeds of which will be used by the District for the Project (hereinafter defined) of the District; and in order to comply with the requirements of the Insurance Law (hereinafter defined), the District and the Office agree for themselves, their successors and assigns, that in connection with the Facilities (hereinafter defined) so long as the Contract of Insurance (hereinafter defined) continue in effect and thereafter if and so long as the Office shall be the owner of the security interest created pursuant to the Indenture (hereinafter defined) and the Deed of Trust (hereinafter defined):

## SECTION I. DEFINITIONS

A. Unless the context clearly otherwise requires, all capitalized terms not defined below and used herein shall have the meanings assigned to such terms in the Indenture hereinafter defined.

B. As used in this Regulatory Agreement the term:

1. "*Accountant*" means any Independent certified public accountant or firm of such accountants with a national or regional reputation selected by the District and not objected to by the Office, and so long as such Accountant is acceptable to the Office. The initial Accountant of TCA Partners, is acceptable to the Office.

2. "*Adjusted Annual Operating Revenues*" means operating revenue and investment income of the District, less contractual allowances, allowance for bad debts and free services for any Fiscal Year, all as determined in accordance with generally accepted accounting principles.

3. "*Affiliate*" means a Person which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the District.

4. "*Aggregate Debt Service*" means, as of any date of calculation and with respect to any period, the sum of amounts of Debt Service for all Long-Term Indebtedness for such period.

5. "*ALTA*" means American Land Title Association.

6. "*Bank*" means NCB Capital Impact, a corporation organized under the laws of the District of Columbia at the direction of the U. S. Congress in 12 U.S.C. 3051.

7. "*Board*" means the Board of Directors of the District.

8. "*Bond Counsel*" means Independent counsel of recognized national standing in the field of obligations the interest on which is excluded from gross income for federal income tax purposes, selected by the District and acceptable to the Office.

9. "*Bonds*" means the 1996 Bonds, the 2009 Bonds or the 2010 Bonds, collectively or individually, as applicable.

10. "*Business Day*" means any day other than a Saturday, Sunday, or a day on which banking institutions in the city in which the Principal Corporate Trust Office of the Trustee is located are authorized or obligated by law or executive order to be closed or a day on which the Federal Reserve System is closed.

11. "*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), as heretofore or hereafter amended from time to time.

12. "*Code*" means the Internal Revenue Code of 1986, as amended.

13. "*Contract of Insurance*" means, collectively or as applicable, (a) the 1996 Contract of Insurance, (b) the 2009 Contract of Insurance, (c) the 2010A Contract of Insurance, and (d) the 2010B Contract of Insurance.

14. "*Debt Service*," when used with respect to any Long-Term Indebtedness, means, as of any date of calculation and with respect to any period, the sum of

-2-

a. the interest falling due on such Long-Term Indebtedness during such period (except to the extent that such interest is payable from the proceeds of such Long-Term Indebtedness set aside for such purpose), and

b. the scheduled principal (or mandatory sinking fund or installment purchase price or lease rental or similar) payments or deposits required with respect to such Long-Term Indebtedness during such period (except to the extent such principal is payable from the proceeds of such Long-Term Indebtedness set aside for such purpose), computed on the assumption that no portion of such Long-Term Indebtedness shall cease to be outstanding during such period except by reason of the application of such scheduled payments, *provided, however*, that for purposes of such computation:

(1) if Long-Term Indebtedness is

(a) secured by an irrevocable letter of credit or irrevocable line of credit issued by a financial institution having a combined capital and surplus of at least fifty million dollars ($50,000,000) and whose unsecured securities are rated in one of the two highest short-term or long-term Rating Categories (without regard to numerical modifier) by each rating agency then rating the Bonds, or

(b) insured by an insurance policy or surety bond issued by an insurance company rated at least A+ by Alfred M. Best Company in Best's Insurance Reports,

principal payments or deposits with respect to such Long-Term Indebtedness nominally due in the last Fiscal Year in which such Long-Term Indebtedness matures may, at the option of the District, be treated as if they were due as specified in any loan agreement or installment sale/purchase agreement issued in connection with such letter of credit, line of credit, insurance policy or surety bond or pursuant to the repayment provisions of such letter of credit, line of credit, insurance policy or surety bond (or, if such loan agreement or installment sale/purchase agreement or repayment provisions provide for repayment over less than 20 years and the Trustee receives a Statement of the District to the effect that the District intends to refinance such Long-Term Indebtedness prior to maturity, as if they were amortized over a 20-year period with substantially level debt service) and interest on such Long-Term Indebtedness after such Fiscal Year shall be assumed to be payable at an interest rate equal to a rate per annum equal to the 25-year revenue bond index most recently published preceding the date of calculation in The Bond Buyer (subject to any adjustment for errors therein which may be acknowledged by the publishers thereof);

(2) if interest on Long-Term Indebtedness is payable pursuant to a variable interest rate formula, the interest rate on such Long-Term Indebtedness for periods when the actual interest rate cannot yet be determined shall be assumed to be equal to the greater of

(a) the average rate of interest borne (or which would have been borne) by such Long-Term Indebtedness during the Fiscal Year immediately preceding the date of calculation plus one percent (1%), or

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 6 of 57

(b) the average rate of interest borne by such Long-Term Indebtedness during the three full calendar months immediately preceding the date of calculation plus one percent (1%);

(3) if interest is capitalized with respect to Long-Term Indebtedness, Debt Service on such Long-Term Indebtedness shall be included in computations of Maximum Aggregate Annual Debt Service under this Regulatory Agreement only in proportion to the amount of interest payable in the then-current Fiscal Year from sources other than amounts funded to pay such capitalized interest;

(4) with respect to a Guarantee, there shall be included in the Debt Service of the District

(a) twenty-five percent (25%) of the District's maximum possible monetary liability under the Guarantee in any Fiscal Year unless the Guarantee is drawn upon, and

(b) one hundred percent (100%) of the District's monetary liability under the Guarantee which has been drawn upon, until such time as all amounts drawn upon the Guarantee have been repaid to the District, and for two Fiscal Years thereafter;

(5) if moneys or Investment Securities described in Subsections (1), (2), (5) or (6) of the definition thereof contained in Section 1.01 of the Indenture (not callable by the issuer thereof prior to maturity) have been deposited with a trustee or escrow agent in an amount, together with earnings thereon, sufficient to pay the principal of or interest on Long-Term Indebtedness as it comes due, such principal or interest, as the case may be, shall not be included in computations of Debt Service; and

(6) principal and interest with respect to general obligation bonded indebtedness shall not be included in computations of Debt Service.

15. *"Deed of Trust"* means each and all of the following, as applicable, (a) that certain Deed of Trust with Fixture Filing and Security Agreement, executed by the District, as trustor, dated as of August 1, 1996, for the benefit of the Office, as beneficiary, securing the performance of certain obligations related to the 1996 Bonds, as amended by that First Supplemental Deed of Trust (Modification of Deed of Trust), dated as of October 1, 2009 related to the 2009 Bonds, (b) that certain Deed of Trust with Fixture Filing and Security Agreement, executed by the District, as trustor, dated as of March 1, 2010, for the benefit of the Office securing the performance of certain obligations related to the 2010 Line of Credit, and (c) that certain Deed of Trust with Fixture Filing and Security Agreement, executed by the District, as trustor, dated as of July 1, 2010, for the benefit of the Office securing the performance of certain obligations related to the 2010 Bonds.

16. *"Deed Trustee"* means the Person at the time serving as such under the Deed of Trust.

17. *"District"* means the District named on the cover hereof, a political subdivision of the State and any entity which may be obligated under the Indenture pursuant to Section VI of this Regulatory Agreement, or any entity which is the surviving, resulting or transferee entity in any merger, consolidation or transfer of assets permitted under this Regulatory Agreement.

18. *"Environmental Claim"* means any accusation, allegation, notice of violation, claim, demand, abatement order or other order or direction (conditional or otherwise) by any

-4-

governmental authority or any person for any damage, including, without limitation, personal injury (including sickness, disease or death), tangible or intangible property damage, contribution, indemnity, indirect or consequential damages, damage to the environment, nuisance, pollution, contamination or other adverse effects on the environment, or for fines, penalties or restrictions, resulting from or based upon

    a. the existence of a Release (whether sudden or nonsudden or accidental or non-accidental) of, or exposure to, any Hazardous Material, in, into or onto the environment at, in, by, from or related to the Facilities,

    b. the use, handling, transportation, storage, treatment or disposal of Hazardous Materials in connection with the operation of the Facilities, or

    c. the violation, or alleged violation, of any statutes, ordinances, orders, rules, regulations, permits, licenses or authorizations of or from any governmental authority, agency or court relating to environmental matters connected with the Facilities.

19. *"Environmental Indemnities"* means the indemnities executed by the District, as indemnitor, in favor of the Office, the Trustee and the other parties named therein, as indemnitees, each setting forth certain indemnification obligations relating to Hazardous Materials.

20. *"Environmental Laws"* means all present and future federal, state or local laws, rules or regulations relating to environmental matters, permits, pollution, waste disposal, industrial hygiene, land use and other requirements of governmental authorities relating to the environment or to any Hazardous Material or Hazardous Material Activity (including, without limitation, CERCLA and the applicable provisions of the California Health and Safety Code and the California Water Code) or the protection of human or animal health or welfare, including, without limitation, those related to any Release or threatened Release of Hazardous Materials and to the generation, use, storage, transportation, or disposal of Hazardous Materials, in any manner applicable to the District or the Facilities.

21. *"Facilities"* means

    a. the real property described in Exhibit A attached hereto and all real property required to be added, from time to time, to this definition of Facilities pursuant to Section XX(H) entitled "Lien on Future Acquired Real Property" of this Regulatory Agreement;

    b. all buildings and structures thereon and fixtures and improvements thereto, whether now existing or hereafter constructed, installed or acquired; and

    c. all tangible personal property owned by the District, whether now existing or hereafter constructed, installed or acquired, and used in, around or about the aforesaid real property, including but not limited to the personal property described in Exhibit B attached hereto.

22. *"Fiscal Year"* means the period set forth on the cover hereof, or any other twelve-month period hereafter selected and designated as the official fiscal year period of the District.

23. *"Gross Revenues"* means all revenues, income, receipts and money received in any period by the District (other than donor-restricted gifts, grants, bequests, donations, contributions and tax revenues), including, but without limiting the generality of the foregoing, the following:

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 8 of 57

a. gross revenues derived from its operation and possession of and pertaining to its properties,

b. proceeds with respect to, arising from, or relating to its properties and derived from (1) insurance (including business interruption insurance) or condemnation proceeds (except to the extent such proceeds are required by the terms of this Regulatory Agreement or other agreements with respect to the Indebtedness which the District is permitted to incur pursuant to the terms of this Regulatory Agreement to be used for purposes inconsistent with their use for the payment of debt service on the Bonds or similar payments with respect to Parity Debt), (2) accounts, including but not limited to, accounts receivable, (3) securities and other investments, (4) inventory and intangible property, (5) payment/reimbursement programs and agreements, and (6) contract rights, accounts, instruments, claims for the payment of moneys and other rights and assets now or hereafter owned, held or possessed by or on behalf of the District, and

c. rentals received from the lease of the District's properties or space in its facilities.

24. *"Guarantee"* means any obligation of the District guaranteeing in any manner, whether directly or indirectly, any obligation of any Person which would, if such Person were the District, constitute Long-Term Indebtedness.

25. *"Hazardous Material Activity"* means any actual, proposed or threatened storage, holding, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Materials from, under, into or on the Facilities or the Project or surrounding property.

26. *"Hazardous Materials"* means

a. any chemical, material or substance now or in the future defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "infectious waste," "toxic pollutant" or "toxic substances" or any other term intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, "TCLP toxicity," "EP toxicity" or words of similar import under any applicable local, state or federal law or under the regulations adopted or publications promulgated pursuant thereto, including, without limitation, Environmental Laws,

b. any oil, petroleum or petroleum-derived substance,

c. any drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources,

d. any flammable substances or explosives,

e. any radioactive materials,

f. asbestos in any form which is or could become friable,

g. urea formaldehyde foam insulation,

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 9 of
57

h. electrical equipment which contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty parts per million,

i. pesticides, and

j. any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority as one that may or could pose a hazard to the health and safety of the owners, occupants or any persons in the vicinity of the Facilities.

27. *"Indebtedness"* means

a. any Guarantee, and

b. any indebtedness or obligation of the District (other than accounts payable and accruals), as determined in accordance with generally accepted accounting principles, including obligations under conditional sales contracts or other title retention contracts, and rental obligations under leases which are considered capital leases under generally accepted accounting principles.

Indebtedness shall not include Nonrecourse Indebtedness and shall not include general obligation bonded indebtedness.

28. *"Indenture"* means that certain indenture, dated as of October 1, 2009, as amended and supplemented by that certain first supplemental indenture, dated as of July 1, 2010, each by and between the District and the Trustee, as amended, modified and supplemented from time to time.

29. *"Independent,"* when referring to an Accountant, counsel, Management Consultant or Person, means an Accountant, counsel, Management Consultant or Person who

a. is independent of and not under the control of the District,

b. does not have any substantial interest, direct or indirect, in the District, and

c. in the case of an individual, is not connected, including through a spouse, with the District as a director, officer or employee of the District, and in the case of a firm, is not connected with the District as a partner, director, officer or employee of the District, but who may be regularly retained by the District.

30. *"Insurance Law"* means Chapter 1, Part 6, Division 107 of the Health and Safety Code of the State, cited as the "California Health Facility Construction Loan Insurance Law" as now in effect and as it may from time to time hereafter be amended or supplemented.

31. *"Loan Agreement"* means that certain Business Loan Agreement, dated March 1, 2010, and maturing on March 1, 2011 being Bank loan number 375397500, by and between the Bank and the District containing additional terms and conditions of the Line of Credit.

32. *"Long-Term Indebtedness"* means Indebtedness having an original maturity greater than one (1) year or renewable at the option of the District for a period greater than one (1) year from the date of original incurrence or issuance thereof unless, by the terms of such Indebtedness, no Indebtedness is permitted to be outstanding thereunder for a period of at least thirty (30) consecutive days during each calendar year.

-7-

33. *"Management Agent"* means that Person or those Persons with whom the District has entered into a contract, whether as an independent contractor or employee, for managerial services, relating to the management or operation of all or substantially all of the Facilities. In the event the District does not have a separate management contract, then "Management Agent" shall mean all of those Persons serving as the District's chief executive officer, chief financial officer, chief operating officer, or other similar officers. In the event the District does not have such officers, then "Management Agent" shall mean all of those Persons that manage or operate all or substantially all of the Facilities.

34. *"Management Consultant"* means an Independent Person of regional or national reputation qualified to report on questions relating to the financial condition, operations and forecasts of health facilities, selected by the District and so long as such Management Consultant is acceptable to the Office.

35. *"Maximum Aggregate Annual Debt Service"* means, as of any date of calculation, the Aggregate Debt Service as computed for the then current or any future Fiscal Year in which such sum shall be largest.

36. *"Maximum Annual Debt Service,"* when used with respect to any item of Long-Term Indebtedness, means, as of any date of calculation, the maximum amount of Debt Service to become due on such Long-Term Indebtedness in the current or any future Fiscal Year after the date of calculation.

37. *"Net Income Available for Debt Service"* means, with respect to any period, the excess of revenues over expenses from operations of the District for such period, determined in accordance with generally accepted accounting principles, to which shall be added unrestricted non-operating net income, interest, amortization, depreciation expense and other non-cash charges, each item determined in accordance with generally accepted accounting principles, and excluding:

a. any profits or losses on the sale or other disposition, not in the ordinary course of business, of investments or fixed or capital assets or resulting from the early extinguishment of debt or losses that are marked to market losses;

b. gifts, grants, bequests, donations and contributions, to the extent specifically restricted by the donor to a particular purpose inconsistent with their use for the payment of Debt Service or operating expenses;

c. the net proceeds of insurance (other than business interruption insurance) and condemnation awards; and

d. tax revenues received for the sole purpose of repaying outstanding general obligation indebtedness.

38. *"1996 Bonds"* means the Mendocino Coast Health Care District Insured Health Facility Revenue Bonds, Series 1996.

39. *"1996 Contract of Insurance"* means that contract of insurance entered into by and between the District and the Office, dated as of August 1, 1996, relating to the 1996 Bonds, as amended, modified and supplemented from time to time.

40. *"Nonrecourse Indebtedness"* means any indebtedness of the District, which is not a general obligation of the District and is secured by a lien on property of the District, liability for which is effectively limited to the property subject to such lien (which property is not integral to

-8-

the operation of the Facilities) with no recourse, directly or indirectly, to any other property of the District.

41. *"Note"* means that certain Promissory Note of the District, as maker, to the Bank, dated as of March 1, 2010, maturing on March 1, 2011, and any amendment, modification, supplement, renewal, revision, or extension thereof.

42. *"Office"* means the Office of Statewide Health Planning and Development of the Health and Human Services Agency of the State, or its successors.

43. *"Parity Debt"* means (a) the obligations of the District with respect to the 1996 Bonds, the 2009 Bonds and the 2010 Bonds, and (b) Long-Term Indebtedness which is incurred by the District in accordance with the provisions of Section XII of this Regulatory Agreement and secured equally and ratably with the obligations of the District under the Indenture by a lien on and security interest in the Gross Revenues.

44. *"Permitted Encumbrances"* means and includes:

a. undetermined liens and charges incident to construction or maintenance, and liens and charges incident to construction or maintenance now or hereafter filed of record which are being contested in good faith and have not proceeded to final judgment (and for which all applicable periods for appeal or review have not expired), provided that the District shall have set aside reserves with respect thereto which, in the opinion of the Office, are adequate;

b. notices of *lis pendens* or other notices of or Liens with respect to pending actions which are being contested in good faith and have not proceeded to final judgment (and for which all applicable periods for appeal or review have not expired), provided that the District shall have set aside reserves with respect thereto which, in the opinion of the Office, are adequate;

c. the lien of taxes and assessments which are not delinquent, or, if delinquent, are being contested in good faith, provided that the District shall have set aside reserves with respect thereto which are adequate;

d. minor defects and irregularities in title to the Facilities which in the aggregate do not materially adversely affect the value or operation of the Facilities for the purposes for which they are or may reasonably be expected to be used;

e. easements, exceptions or reservations for the purpose of ingress and egress, parking, pipelines, telephone lines, telegraph lines, power lines and substations, roads, streets, alleys, highways, railroad purposes, drainage and sewerage purposes, dikes, canals, laterals, ditches, the removal of oil, gas, coal or other minerals, and other like purposes, or for the joint or common use of real property, facilities and equipment, which in the aggregate do not materially interfere with or impair the operation of the Facilities for the purposes for which they are or may reasonably be expected to be used;

f. rights reserved to or vested in any municipality or governmental or other public authority to control or regulate or use in any manner any portion of the Facilities which do not materially impair the operation of the Facilities for the purposes for which they are or may reasonably be expected to be used;

g. present or future valid zoning laws and ordinances;

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 12 of 57

h. the rights of the District, the Office, the Trustee and holders of Parity Debt under the Indenture, this Regulatory Agreement and the Deed of Trust and the lien and charge of the Indenture, this Regulatory Agreement and the Deed of Trust;

i. liens securing indebtedness for the payment, redemption or satisfaction of which money (or evidences of indebtedness) in the necessary amount shall have been deposited in trust with a trustee or other holder of such indebtedness;

j. purchase money security interests and security interests existing on any personal property prior to the time of its acquisition by the District through purchase, merger, consolidation or otherwise, whether or not assumed by the District, or placed upon property being acquired by the District to secure a portion of the purchase price thereof, or lessor's interests in leases required to be capitalized in accordance with generally accepted accounting principles;

k. statutory liens arising in the ordinary course of business which are not delinquent or are being contested in good faith by the District;

l. the lease or license of the use of a part of the Facilities for use in performing professional or other services necessary for the proper and economical operation of the Facilities in accordance with customary business practices in the health care industry;

m. liens or encumbrances existing as of the date of initial execution and delivery of the Bonds as listed on Exhibit D attached hereto;

n. liens securing Parity Debt on a parity with the obligations of the District hereunder;

o. statutory rights of the United States of America to recover against the District by reason of federal funds made available under 42 U.S.C. § 291 *et seq.*, and similar rights under other federal and state statutes;

p. a prior security interest in the District's accounts receivable to provide short-term borrowing as permitted under Section IX(A)(3) hereof, subject to the prior consent of the Office; and

q. other liens and encumbrances specifically approved in writing by the Office.

45. *"Person"* means a natural person, individual, company, firm, association, organization, partnership, trust, corporation or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

46. *"Project"* means, collectively, the 1996 Project, the 2009 Project, the 3/2010 Project and the 7/2010 Project, each as set forth on the cover of this Regulatory Agreement.

47. *"Release"* means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, leaching, or migration into the indoor or outdoor environment (including, without limitation, the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), or into or out of the Facilities, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

48. *"Risk Management Consultant"* means an Independent Person having experience and a favorable reputation in consulting on the insurance requirements of health facilities in the

-10-

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 13 of 57

State of the general size and character of the Facilities, selected by the District and not objected to by the Office, and so long as such Risk Management Consultant is acceptable to the Office. The initial Risk Management Consultant of Brown and Alliant Insurance Services, Inc. is acceptable to the Office.

49. *"Short-Term Indebtedness"* means Indebtedness having an original maturity less than or equal to one year and not renewable at the option of the District for a term greater than one year from the date of original incurrence or issuance unless, by the terms of such Indebtedness, no Indebtedness is permitted to be outstanding thereunder for a period of at least thirty (30) consecutive days during each calendar year.

50. *"State"* means the State of California.

51. *"Statement"* means a written certification, certificate or statement or other appropriate written instrument normally provided in the applicable circumstance where required by this Regulatory Agreement to be provided or delivered by the Accountant, counsel, insurance agent, Risk Management Consultant, Management Consultant, District, Office or other appropriate Person. The Statement shall be dated and signed by a person authorized to execute the Statement.

52. *"Trustee"* means the Trustee named on the cover hereof, as trustee, together with the Trustee's permitted successors as trustee, under the Indenture.

53. *"2009 Bonds"* means the Mendocino Coast Health Care District Insured Health Facility Revenue Bonds, Series 2009, issued under the Indenture.

54. *"2009 Contract of Insurance"* means that contract of insurance entered into by and between the District and the Office, dated as of October 1, 2009, relating to the 2009 Bonds, as amended, modified and supplemented from time to time.

55. *"2010 Bonds"* means the Mendocino Coast Health Care District Insured Health Facility Revenue Bonds, Series 2010, issued under the Indenture.

56. *"2010A Contract of Insurance"* means that contract of insurance entered into by and between the District and the Office, dated as of March 1, 2010, relating to the 2010 Line of Credit, as amended, modified and supplemented from time to time.

57. *"2010B Contract of Insurance"* means that contract of insurance entered into by and between the District and the Office, dated as of July 1, 2010, relating to the 2010 Bonds, as amended, modified and supplemented from time to time.

58. *"2010 Line of Credit"* means that certain $1,000,000 revolving line of credit available to the District, pursuant to the terms and conditions of the Loan Agreement and evidenced by the Note, maturing on March 1, 2011, and being Bank Loan No. 375397500, and any amendment, modification, change in term agreement, supplement, renewal, revision, or extension thereof subsequently insured by the Office.

SECTION II. GENERAL COVENANTS

A. Security of Gross Revenues Pledged and Deed of Trust.

1. In order to secure full and faithful performance of the obligations of the District to the Office hereunder and under the Contract of Insurance, the District hereby

-11-

pledges to the Office and grants to the Office a security interest in and to the Gross Revenues, including, but not limited to, future interest in any and all revenues or incomes of any nature or kind which accrue to the District or Facilities, as well as other collateral, all as set forth in Exhibit E hereto. The District shall execute and deliver to the Office upon the effective date of this Regulatory Agreement UCC-1 Financing Statements and such additional UCC-1 Financing Statements, continuation statements, control agreements, and other documentation as demanded by the Office in order to further evidence, perfect and maintain the security interest granted hereby.

2. In addition, full and faithful performance of the obligations hereunder and under the Contract of Insurance by the District to the Office is hereby deemed further secured by the lien on the Facilities created by the District pursuant to the Deed of Trust. The District covenants and agrees that the lien of the Deed of Trust shall be subject only to:

a. liens, conditions, covenants and restrictions, easements, taxes, and assessments of record approved by the Office as exceptions to the ALTA title insurance policy identified on the first page of this Regulatory Agreement, and

b. Permitted Encumbrances.

3. The District hereby pledges to the Office and grants to the Office a security interest in and to, revenues (including Gross Revenues), moneys, accounts, accounts receivable, contract rights, general intangibles, documents, instruments, chattel paper, and other rights to payment of whatever kind, to secure the obligations of the Office under this Regulatory Agreement and the Contract of Insurance. Notice is hereby given that the lien of the above stated pledges created by this Regulatory Agreement is perfected pursuant to California Health and Safety Code Sec. 129052, which reads in pertinent part:

"The revenues, moneys, accounts, accounts receivable, contract rights, general intangibles, documents, instruments, chattel paper, and other rights to payment of whatever kind pledged by or to the office or its assignees shall immediately be subject to the lien of the pledge without physical delivery or further act. The lien of such pledge shall be valid and binding against all parties, irrespective of whether the parties have notice of the lien. The indenture, trust agreement, resolution, or another instrument by which such pledge is created need not be recorded or the security interest otherwise perfected."

B. Use of Proceeds of Bonds. The proceeds of the Bonds together with other available funds shall be used exclusively by the District to finance the Project, and for reimbursing the District for costs thereof previously made, including but not limited to any or all expenses incidental thereto or connected therewith, to fund a Bond Reserve Account established under the Indenture, and to pay expenses related to the execution and issuance of the Bonds.

**NONE OF THE PROCEEDS OF THE BONDS SHALL GO DIRECTLY OR INDIRECTLY TO ANY PRESENT OR FORMER OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR RELATIVE OF ANY OFFICER, DIRECTOR, MEMBER OR EMPLOYEE OF THE DISTRICT.**

C. Bond Maturity Date; Economic Life. Pursuant to Insurance Law Section 129050(d) the Bonds shall have a maturity date or dates not exceeding thirty (30) years from the beginning of the amortization of the Bonds, as provided in the Bonds and the Indenture, which term does not exceed 75% of the Office's estimate of the economic life of the Facilities.

-12-

D. <u>Periodic Payments</u>. The Indenture contains complete amortization provisions requiring periodic payments by the District, as provided in the Bonds, which provisions are acceptable to the Office.

E. <u>Interest on Bonds</u>. The Bonds bear interest on the amount of the principal obligation outstanding at any time, at the rates provided in the Bonds, which rates are acceptable to the Office.

F. <u>Payment on Principal</u>. The Indenture provides for the application of a portion of the District's periodic payments to amortization of the principal of the Bonds as provided in the Indenture and the Bonds.

G. <u>Documents Acceptable to Office</u>. The Indenture is acceptable to the Office.

H. <u>Section 129050(i) Limitation</u>. To the extent Insurance Law Section 129050(i) applies, the Bonds shall be in a principal amount not in excess of the amount set forth on the cover of this Regulatory Agreement, which amount does not exceed 95 percent of the "total construction, renovation or acquisition cost" of the Project plus the sum of the amounts set forth in Section 3.02 of the Indenture.

I. <u>Payments</u>. The District, through the Trustee pursuant to the Indenture, shall promptly make all payments for which it is obligated under the Bonds, the Indenture, the Note and the Loan Agreement, as the case may be.

J. <u>Debt Service Reserve Account</u>. The District shall cause the Trustee to establish and continue to maintain a debt service reserve account (i.e., the Bond Reserve Account established pursuant to the Indenture) which shall be subject to the terms and conditions specified in the Indenture and which may be disbursed only on order of the Office as provided in the Indenture.

K. <u>Compliance with Insurance Law</u>. The District shall comply with all applicable laws including, specifically, the Insurance Law.

L. <u>Compliance with Agreements; No Amendment without Office Consent</u>. The District shall abide by all of the terms of the Bonds, the Deed of Trust and the Indenture by which it is bound, none of which may be modified, amended or supplemented without the prior or concurrent consent of the Office in writing.

M. <u>Office Attendance at Meetings</u>. The Office has the right to attend and participate in all meetings of the members of the governing board of the District including, but not limited to, executive committee, subcommittee meetings and all other committee meetings, but excluding meetings at which attendance by the Office would abrogate the attorney-client privilege between the District and its legal counsel. Upon prior written request of the Office, the District shall give the Office, prior to any such meetings, the same notice of such meetings as it gives to its board members and shall give the Office a copy of all documents given to its board members at the same time they give the documents to its board members, and shall give the Office copies of any other documents presented at such meetings.

N. <u>Prohibition of Forward Purchase Agreements</u>. Notwithstanding any other provision in this Regulatory Agreement or the Indenture, the District shall not enter into or instruct the Trustee to enter into any agreement, including, without limitation, any investment or sale agreement involving the sale of future interest income or forward delivery agreement or forward purchase contract or forward purchase supply contract, which provides for an upfront

-13-

payment to the District, in connection with the investment of any of the funds or accounts established under the Indenture and held by the Trustee.

O. <u>Provision of Essential Governmental Services</u>. The District and the Office hereby confirm that the District is presently providing, and the District hereby covenants to continue to provide, essential governmental services such that the District meets the requirements of the Federal Emergency Management Agency (FEMA) to be eligible for relief for disasters to the maximum extent allowed by law, including 44 Code of Federal Regulations, Chapter 1.

P. <u>Use of Moneys Drawn under the Line of Credit</u>. The moneys drawn by the District under the Line of Credit shall be used exclusively by the District for the following purposes: to finance working capital and pay expenses related to the execution and issuance of the Line of Credit and the Note, including fees and expenses of the Office. Notwithstanding the foregoing, no moneys shall be drawn by the District under the Line of Credit unless prior to each disbursement of funds under the Note and Loan Agreement, the District obtains the written authorization for the disbursement of funds to the District by the Office. The following shall constitute such written authorization: (i) Form OSH-CM-134 submitted to the Bank by the District and executed by the Office; (ii) a written authorization to disburse a particular sum on the letterhead of, and executed by, the Office; or (iii) a facsimile of the above transmitted by the Office to the Bank.

EXCEPT AS EXPRESSLY PERMITTED HEREIN, NONE OF THE MONEYS DRAWN UNDER THE LINE OF CREDIT SHALL GO DIRECTLY OR INDIRECTLY TO ANY PRESENT OR FORMER OFFICER, DIRECTOR, MEMBER, EMPLOYEE OR RELATIVE OF ANY OFFICER, DIRECTOR, MEMBER OR EMPLOYEE OF THE DISTRICT.

SECTION III. <u>NEGATIVE COVENANTS</u>

The District shall not, without the prior written consent of the Office:

A. <u>Alter Facilities</u>. Remodel, reconstruct, or demolish any part of the Facilities (except in the ordinary course of business) or subtract from any real property of the District except for the maintenance described in the regulations of the relevant State licensing agencies, which may be accomplished without limitation.

B. <u>Pay Officers or Directors</u>. Pay any compensation or make any distribution of income or other assets to any of its officers or directors other than as compensation to such persons in their capacities as officers, directors, employees, contractors or suppliers of the District or the reimbursement of ordinary out-of-pocket expenses.

C. <u>Affiliations</u>. Except for affiliations or contracts with public agencies, health maintenance organizations and other health care plans and providers entered into by the District in its ordinary course of business, establish, maintain, or affiliate with a Person in conjunction with which the District will carry on its activities; transfer control of any of the Facilities to any other Person; or assume, either directly, indirectly or through intermediaries, the management or control of any other Person, unless in each such case

1. the Contract of Insurance remains in full force and effect after such act, and

2. no event of default under this Regulatory Agreement has occurred and is continuing or will, as a result of such act, occur.

-14-

D. <u>Cease to Operate as a Health Facility</u>. Cease to operate the Facilities such that the Facilities no longer qualify as a "health facility" as defined in Insurance Law Section 129010, except to the extent permitted by the Insurance Law.

## SECTION IV. <u>MAINTENANCE OF THE FACILITIES</u>

The District shall maintain the Facilities in good and substantial repair and condition; provided that, in the event all or any of the Facilities shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of this Regulatory Agreement and the Indenture.

## SECTION V. <u>BANKRUPTCY; INSOLVENCY; RECEIVER</u>

A. The District shall not file any petition in bankruptcy or in insolvency, or for a receiver or reorganization or composition; or make any assignment for the benefit of creditors or to a trustee for creditors; or permit an adjudication in bankruptcy, the taking possession of the Facilities or any part thereof by a receiver, or the seizure and sale of the Facilities or any part thereof under judicial process or pursuant to any power of sale (except as provided in the Deed of Trust) and fail to have such adverse actions set aside within forty-five (45) days.

B. The District immediately shall give notice to the Office of the filing of any petition, or commencement of any proceedings, in bankruptcy, or for a receiver or insolvency or for reorganization or composition, or any assignment for the benefit of creditors to a trustee for the benefit of creditors, relating to the District or the Facilities.

C. If the District, or its creditors, file a petition alleging insolvency, requesting reorganization or a composition of creditors, or for an assignment for the benefit of creditors, in any court, the Office shall have the right to participate in, or vote on, any plan or reorganization, agreement for a composition of creditors, and on any assignment for the benefit of creditors. If there is a proceeding to effect a receivership for the District, the Office shall have the right to select the receiver.

So long as the Contract of Insurance is in full force and effect and the Office is not in default thereunder, the Office shall represent Bondholders in all bankruptcy proceedings and may take such action or consent to any agreement on behalf of Bondholders, provided that any such action or consent shall in no way impair the rights and benefits due Bondholders under the Contract of Insurance.

## SECTION VI. <u>MAINTENANCE OF EXISTENCE; AFFILIATION, MERGER, CONSOLIDATION, SALE OR TRANSFER UNDER CERTAIN CONDITIONS</u>

A. The District shall maintain its existence as a local healthcare district of the State, operating a health facility, and shall not dissolve, sell or otherwise dispose of all or substantially all of its assets or affiliate with, consolidate with or merge into another Person or permit one or more other Persons to affiliate with, consolidate with or merge into it; provided, that the District may, without violating the covenants contained in this Section, affiliate with, consolidate with or merge into another Person, or permit one or more other Persons to affiliate with, consolidate with or merge into it, or sell or otherwise transfer to another Person such assets, if:

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 18 of 57

1. The District obtains the written consent of the Office to such transaction and a Statement of the Office to the effect that the Contract of Insurance remains in full force and effect after such transaction;

2. The District, the Office and the Trustee shall have received an Opinion of Bond Counsel to the effect that such affiliation, merger, consolidation, sale or other transfer will not cause the interest on the Bonds to be included in gross income for federal income tax purposes under Section 103 of the Code;

3. The surviving, resulting or transferee Person:

a. assumes in writing, if such Person is not the District, all of the obligations of the District under this Regulatory Agreement and the Indenture, and agrees to fulfill and comply with the terms, covenants and conditions thereof;

b. is not, after such transaction, otherwise in default under any provision of this Regulatory Agreement or the Indenture;

c. is a local healthcare District, a political subdivision of the State or an organization meeting the requirements of Section 501(c)(3) of the Code, or a corresponding provision of the federal income tax laws then in effect; and

d. shall have fund balances at least equal to the fund balances of the District prior to such transaction;

4. The Trustee and the Office shall have received the report of a Management Consultant to the effect that Net Income Available for Debt Service of the surviving, resulting or transferee Person (after giving effect to such merger, consolidation, sale or other transfer) for each of the first two full Fiscal Years following such merger, consolidation, sale or other transfer is forecasted to be not less than the greater of Net Income Available for Debt Service of the District for each of the two most recent Fiscal Years for which audited financial statements are available, as certified by an Accountant;

5. The Trustee and the Office shall have received a report of an Accountant to the effect that the net worth of the surviving, resulting or transferee Person, after giving effect to such merger, consolidation, sale or other transfer, is at least equal to 100 percent of the net worth of the District immediately prior to such merger, consolidation, sale or other transfer; and

6. The Trustee and the Office shall have received an Opinion of Counsel to the effect that the Indenture and this Regulatory Agreement constitute the legal, valid and binding obligations of the surviving, resulting or transferee Person, as the case may be, enforceable against such Person in accordance with their respective terms.

B. Notwithstanding the foregoing, the District may, without complying with the provisions of Subsection A of this Section, transfer substantially all of its assets to an Affiliate provided that:

1. The District obtains the written consent of the Office to such transaction and the Contract of Insurance remains in full force and effect after such transaction;

2. The Office, the District and the Trustee shall have received an Opinion of Bond Counsel to the effect that such proposed transfer(s) will not cause the interest on the

-16-

Bonds to be included in the gross income for federal income tax purposes under Section 103 of the Code;

3. Such Affiliate agrees to become a co-obligor and jointly and severally liable with the District under this Regulatory Agreement and the Indenture; and

4. After such transaction, the District and the Affiliate are in compliance with the provisions of this Regulatory Agreement and the Indenture.

In the event of such a transfer to an Affiliate, references in this Regulatory Agreement to indebtedness of the District shall apply to the combined indebtedness of the District and the Affiliate, and references to the financial condition or forecasted results of operations of the District shall apply to the consolidated financial condition or results of operations of the District and the Affiliate.

C. If an affiliation, merger, consolidation, sale or other transfer is effected, as provided in this Section, the provisions of this Section shall continue in full force and effect, and no further affiliation, merger, consolidation, sale or transfer shall be effected except in accordance with the provisions of this Section.

SECTION VII. RATES AND CHARGES; DEBT COVERAGE; CURRENT RATIO; DAYS CASH ON HAND

A. The District shall operate the Facilities as revenue producing health care facilities. The District shall fix, charge and collect, or cause to be fixed, charged and collected, subject to applicable requirements or restrictions imposed by law, such rates, fees and charges which, together with all other receipts and revenues of the District and any other funds available therefor, are reasonably projected to be sufficient in each Fiscal Year (commencing with the Fiscal Year beginning July 1, 2010) to produce Net Income Available for Debt Service equal to at least 1.25 times Maximum Aggregate Annual Debt Service for such Fiscal Year.

B. The District shall maintain, as of the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2010, a current ratio (a ratio of current assets (including funded depreciation and Board designated funds) to current liabilities, as determined in accordance with generally accepted accounting principles and as shown on the District's audited financial statements for such Fiscal Year) of at least 1.50:1.0.

C. The District shall maintain, as of the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2011, at least thirty (30) Days Cash on Hand, as shown on the District's audited financial statements for such Fiscal Year. For purposes of this requirement, "Days Cash on Hand" shall mean, for any Fiscal Year, the quotient obtained by dividing (1) the District's cash and cash equivalents (including funded depreciation and Board designated funds) excluding proceeds of short term debt as of the end of such Fiscal Year by (2) the quotient of dividing (a) the District's operating expenses (excluding depreciation, amortization, allowance for bad debts, and any other noncash expenses) for such Fiscal Year by (b) the number of days in such Fiscal Year.

D. Within one hundred fifty (150) days after the end of each Fiscal Year (commencing with the Fiscal Year beginning on July 1, 2010), the District shall compute (1) the Net Income Available for Debt Service and Maximum Aggregate Annual Debt Service, (2) the current ratio and (3) the Days Cash on Hand for such Fiscal Year and promptly furnish to the Trustee and the Office a Statement setting forth the results of such computation. The District further covenants and agrees that if, at the end of such Fiscal Year, the Net Income Available for Debt Service, the

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 20 of 57

current ratio or the Days Cash on Hand shall have been less than as required by Subsections A, B or C, respectively, of this Section VII, it will promptly employ a Management Consultant to make recommendations as to a revision of the rates, fees and charges of the District or the methods of operation of the District which will result in producing Net Income Available for Debt Service, a current ratio and Days Cash on Hand as required by Subsections A, B and C, respectively, of this Section VII in the current Fiscal Year; provided, however, the District need not so employ a Management Consultant if the Office consents, in writing, to a waiver of said covenant to employ a Management Consultant. Copies of the recommendations of the Management Consultant shall be filed with the Trustee and the Office. The District shall, to the extent feasible, promptly upon its receipt of such recommendations, subject to applicable requirements or restrictions imposed by law, revise its rates, fees and charges or its methods of operation or collections and shall take such other action as shall be in conformity with such recommendations; provided, however, the District need not make such revisions or take such actions in conformity with such recommendations if the Board makes a good faith determination that such recommendations, in whole or in part, are not in the best interests of the District and (2) the Office gives its written consent to the effect that the District need not comply, in whole or in part, with such recommendations. In the event that the District fails to comply with the recommendations of the Management Consultant, the Office may replace existing management with new management, which shall be chosen unilaterally by the Office.

If the District complies in all material respects with the reasonable recommendations of the Management Consultant in respect to said rates, fees, charges and methods of operation or collection, the District will be deemed to have complied with the covenants contained in this Section VII for such Fiscal Year, notwithstanding that Net Income Available for Debt Service, the current ratio or the Days Cash on Hand shall be less than the amount required under Subsections A, B or C of this Section VII; provided that this sentence shall not be construed as in any way excusing the District from taking any action or performing any duty required under this Regulatory Agreement or be construed as constituting a waiver of any other event of default under this Regulatory Agreement.

E. Notwithstanding the foregoing, the District may permit the rendering of service at, or the use of, the Facilities without charge or at reduced charges, at the discretion of the Board, to the extent necessary for maintaining its tax-exempt status or to establish or maintain its eligibility for grants, loans, subsidies or payments from the United States of America, any instrumentality thereof, or the State or any political subdivision or instrumentality thereof, or in compliance with any recommendation for free services that may be made by the Management Consultant.

## SECTION VIII. LIMITATION ON ENCUMBRANCES

The District shall not create, assume or suffer to exist and shall immediately satisfy or release any mortgage, deed of trust, pledge, security interest, encumbrance, lien, attachment or charge of any kind (including the charge upon property purchased under conditional sales or other title retention agreements) upon the Facilities or the Gross Revenues; *provided, however,* that notwithstanding the foregoing provision, the District may create, assume or suffer to exist Permitted Encumbrances.

## SECTION IX. LIMITATION ON INDEBTEDNESS

A. The District shall not incur any indebtedness or financial obligations, including without limitation, by borrowing money, by assuming or guaranteeing the obligations of others, and by entering into installment purchase contracts or leases required to be capitalized in

-18-

accordance with generally accepted accounting principles, except the District may incur the following:

1. Obligations and liabilities under this Regulatory Agreement or the Indenture, including any supplements or amendments thereto or hereto in connection with the issuance of any additional series of Bonds;

2. Contractual liabilities (other than liabilities for borrowed money or liabilities which would otherwise be considered indebtedness under generally accepted accounting principles) for which moneys are available in the Project Fund under the Indenture or otherwise;

3. Short-Term Indebtedness with the prior written consent of the Office and provided that no amount of Short-Term Indebtedness shall be outstanding for a period of thirty (30) consecutive days during each Fiscal Year. The aggregate amount incurred by the District under this Subsection shall not exceed at the time of incurrence ten percent (10%) of the District's Adjusted Annual Operating Revenues for the most recent Fiscal Year for which audited financial statements are available;

4. Liabilities for contributions to self-insurance programs;

5. Long-Term Indebtedness (which may be Parity Debt) incurred for the purpose of refinancing outstanding Long-Term Indebtedness provided that

a. the Office has consented in writing to the incurring of such indebtedness, and

b. the issuance of such Long-Term Indebtedness does not increase Maximum Aggregate Annual Debt Service by more than ten percent (10%), as certified by a written report of an Accountant which shall be filed with the Trustee and the Office;

6. Long-Term Indebtedness (which may be Parity Debt), provided that

a. the Office has consented in writing to the incurring of such indebtedness, and

b. (1) Net Income Available for Debt Service, as certified by a written report of an Accountant which shall be filed with the District, the Trustee and the Office for the most recent Fiscal Year for which audited financial statements are available immediately preceding the date of incurrence of such Long-Term Indebtedness was at least equal to 1.10 times Maximum Aggregate Annual Debt Service on all outstanding Long-Term Indebtedness and the Long-Term Indebtedness proposed to be incurred, or

(2) (a) Net Income Available for Debt Service, as certified by a written report of an Accountant which shall be filed with the District, the Trustee and the Office, for the most recent Fiscal Year for which audited financial statements are available immediately preceding the date of incurrence of such Long-Term Indebtedness was at least equal to 1.10 times Maximum Aggregate Annual Debt Service on all Long-Term Indebtedness then outstanding, and

-19-

(b) Net Income Available for Debt Service, as shown in a written feasibility report prepared by a Management Consultant and filed with the District, the Trustee and the Office, for each of the first two Fiscal Years following the incurrence of such Long-Term Indebtedness (or, if such Long-Term Indebtedness is incurred to finance additional facilities, in each of the first three Fiscal Years following the Fiscal Year when it is proposed that such Facilities will be completed and placed in service) is forecasted to be at least 1.10 times Maximum Aggregate Annual Debt Service on all Long-Term Indebtedness proposed to be outstanding at the end of each such Fiscal Year;

7. Long-Term Indebtedness (which may be Parity Debt), incurred to complete the Project or any other project if the Board certifies that the District cannot complete such project unless such Long-Term Indebtedness is incurred, provided that

a. the Office has consented in writing to the incurring of such indebtedness, and

b. in the case of a project other than the Project, the aggregate principal amount of such indebtedness does not exceed ten percent (10%) of the principal amount of Long-Term Indebtedness incurred to finance such project;

8. Long-Term Indebtedness (excluding Parity Debt) provided that

a. the Office has consented in writing to the incurring of such indebtedness, and

b. the aggregate amount incurred by the District under this Subsection, Subsection 3 and Subsection 9 and outstanding shall not exceed at the time of incurrence ten percent (10%) of the District's Adjusted Annual Operating Revenues for the most recent Fiscal Year for which audited financial statements are available;

9. Liabilities under capitalized lease agreements for the lease of, or indebtedness for money borrowed or liabilities under instruments evidencing deferred payment arrangements for the purchase of, equipment, tangible personal property or real property; provided that the aggregate amount incurred by the District under this Subsection, Subsection 3 and Subsection 8 and outstanding shall not exceed at the time of incurrence ten percent (10%) of the District's Adjusted Annual Operating Revenues for the latest Fiscal Year for which audited financial statements are available;

10. Nonrecourse Indebtedness, provided that the Office has approved in writing the incurrence of such indebtedness and such indebtedness does not encumber the Facilities;

11. Repayment obligations under reimbursement or similar agreements with banks or insurance companies relating to letters or lines of credit or other credit facilities used to secure Long-Term Indebtedness;

12. Indebtedness, not for borrowed money, incurred in the ordinary course of business; and

13. Any indebtedness or obligations of the District consented to in writing by the Office.

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 23
of 57

SECTION X. <u>LIMITATIONS ON DISPOSITION OF PROPERTY</u>

A. <u>Disposition of Cash</u>. The District shall not dispose of any cash or cash equivalents unless

    1. the District receives an asset or service of reasonably equivalent value for such cash or cash equivalents; or

    2. prior to such disposition, there is filed with the Office and the Trustee a Statement of the District to the effect that either

        a. the ratio of Net Income Available for Debt Service to Maximum Aggregate Annual Debt Service for the most recent Fiscal Year for which audited financial statements are available next preceding such disposition would not be reduced or, if reduced, would not be reduced below a ratio of 1.25:1.0 (such calculation to be made assuming such disposition had occurred at the beginning of such Fiscal Year), or

        b. the average ratio of Net Income Available for Debt Service to Maximum Aggregate Annual Debt Service, as forecasted in such Statement of the District for the two Fiscal Years immediately following such disposition, will be not less than a ratio of 1.25:1.0; and

    3. such disposition has been consented to by the Office.

B. <u>Disposition of Real Property</u>. The District shall not sell, lease, sublease, assign, transfer, encumber or otherwise dispose of all or any part or parts of the real property described in Exhibit A, including the buildings and structures thereon and fixtures and improvements of such real property, without the prior written consent of the Office.

C. <u>Disposition of Personal Property</u>. The District shall not sell, lease, sublease, assign, transfer, encumber or otherwise dispose of all or any part or parts of the Facilities not included in the preceding subsections A and B, other than in the "ordinary course of business," unless the Office gives its prior written consent to such disposition. "Ordinary course of business" may be defined and redefined after the date of this Regulatory Agreement from time to time, unilaterally, by the Office, in the Office's sole discretion, by the Office giving written notice of such new definition to the District, which new definition will become effective on receipt of such notice by the District.

Except as provided in Section VI of this Regulatory Agreement concerning a disposition of substantially all of the District's assets, in no event shall the District dispose of any part or parts of its Facilities in any Fiscal Year aggregating in excess of two and one-half percent (2-1/2%) of the District's net property, plant and equipment (as shown on the District's most recent audited financial statements), unless the Office gives its prior written consent to such disposition.

D. <u>Execution of Releases</u>. In connection with a disposal of property, including cash, permitted by this Section, upon receipt of such consent by the Office or Statement of the District required by this Section, the Office and the Trustee shall execute and deliver releases from security interests or other documents reasonably requested by the District.

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 24 of 57

## SECTION XI. LIMITATION ON ACQUISITION OF PROPERTY, PLANT AND EQUIPMENT

The District shall not acquire additional property, plant and equipment (except (1) in the ordinary course of business, (2) with the proceeds of indebtedness permitted by Section IX of this Regulatory Agreement, or (3) as part of a merger or consolidation permitted by Section VI of this Regulatory Agreement) by gift (other than gifts of cash or personal property or gifts of real property if either (i) its use is residential or (ii) it is subject of a phase I report indicating no contaminants), purchase, construction, merger or consolidation, unless the Office gives its prior written consent to such acquisition.

## SECTION XII. PARITY DEBT

The District may incur Parity Debt, subject, however to compliance with Section IX of this Regulatory Agreement and the following conditions:

1. The Trustee, or any successor to the Trustee as provided in the Indenture, shall act as trustee for the Parity Debt;

2. The agreement under which Parity Debt is issued shall require that:

a. An Event of Default under the Indenture shall constitute an event of default under such agreement and this Regulatory Agreement;

b. Rights and obligations of the holders of Parity Debt shall be substantially the same as the rights and obligations of the Holders of Bonds under the Indenture, except that if the Parity Debt is not covered under the Contract of Insurance, the holders of Parity Debt shall have no rights under the Contract of Insurance for payments made with respect thereto; and

c. Remedies upon an event of default shall be substantially the same as the remedies provided in the Indenture and this Regulatory Agreement, and, prior to exercising any such remedies, the holders of such Parity Debt (or a trustee representing their interest) shall be required to cooperate with the Trustee to the end that the interests of such holders and the Bondholders shall be equally protected;

3. Any collateral given or to be given to secure Parity Debt shall also secure the Bonds on a pari passu basis; provided that the Bond Reserve Account shall only secure the Bonds and the District may but need not establish similar reserve accounts for debt service of Parity Debt;

4. The Parity Debt shall be prepayable in accordance with terms substantially in the form of and under the conditions prescribed in Section 4.01(A) of the Indenture; and

5. The Parity Debt shall be insured by the Office under the Insurance Law, or if the Parity Debt can be issued as such without being insured under the Insurance Law, with the consent of the Office.

## SECTION XIII. COMPLIANCE WITH LAW; MAINTENANCE OF FACILITIES

A. In Accordance with the Law. The District shall operate and maintain the Facilities in material accordance with all applicable governmental laws, ordinances, approvals, rules,

regulations and requirements including, without limitation, such zoning, sanitary, pollution and safety ordinances and laws, including the Insurance Law, and such rules and regulations thereunder as may be binding upon the District. The District shall make all disclosures required by the Securities and Exchange Commission and shall indemnify the Office for any costs, fees, fines, or other penalties imposed on the Office which arise from, or are incurred from, the District's negligent or other failure to disclose annual financial and operating information as required by the Securities and Exchange Commission.

B. In Good Repair. The District shall maintain and operate the Facilities and all engines, boilers, pumps, machinery, apparatus, fixtures, fittings and equipment of any kind in or that shall be placed in any building or structure now or hereafter at any time constituting part of the Facilities, in good repair, working order and condition, and the District shall from time to time make or cause to be made all needful and proper replacements, repairs, renewals and improvements; in each case to the extent necessary so that the efficiency and value of the Facilities shall not be impaired.

## SECTION XIV. TAXES, ASSESSMENTS AND GOVERNMENTAL CHARGES

The District shall pay and discharge all taxes, assessments, governmental charges of any kind whatsoever, water rates, meter charges and other utility charges which may be or have been assessed or which may have become liens upon the Facilities, the Gross Revenues or the interests therein of the Trustee or of the Holders of the Bonds, and will make such payments or cause such payments to be made, respectively, in due time to prevent any delinquency thereon or any forfeiture or sale of the Facilities or any part thereof, and, upon request, shall furnish to the Trustee receipts for all such payments, or other evidences satisfactory to the Trustee; *provided, however,* that the District shall not be required to pay any tax, assessment, rate or charge as herein provided as long as it shall in good faith contest the validity thereof, provided that the District shall have set aside adequate reserves with respect thereto.

## SECTION XV. INSURANCE

A. Maintain Insurance. The District shall keep the Facilities and their operations adequately insured at all times, and, shall carry and maintain, or cause to be carried and maintained, and will pay, or cause to be paid, in timely fashion the premiums for, at least the following coverages with the limits as stated. The following coverages and limits may be varied only with the prior written consent of the Office.

1. *Property Insurance.*

a. **Buildings and Structures**. All buildings and structures constituting part of the Facilities shall, at a minimum, be insured using a form at least as broad as the most recent revision of the Property Special Form coverage adopted by the Insurance Services Office (ISO), subject to a reasonable deductible per occurrence, and in an amount equal to at least the lesser of the full replacement value of the property insured, or the aggregate principal amount of the Outstanding Bonds and Parity Debt. The replacement value of the Facilities shall be determined from time to time at the request of the District or the Trustee (but not less frequently than once in every twenty-four months) by an architect, contractor, appraiser or appraisal company selected by the District or its insurance company and acceptable to the Office. The Office and the Trustee shall be loss payees on all policies maintained pursuant to this subdivision. The policy

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 26 of 57

form shall also include a Joint Loss Endorsement as respects Boiler & Machinery insurance.

b. **Business Personal Property**. All business personal property, including computers and electronic data processing equipment, at any location forming part of the Facilities shall be insured using a form at least as broad as the most recent revision of the Property Special Form coverage adopted by the ISO, subject to a reasonable deductible per occurrence and in an amount equal to at least the lesser of the full replacement value of the property insured or the aggregate principal amount of the Outstanding Bonds and Parity Debt. The Office and the Trustee shall be loss payees on all policies maintained pursuant to this subdivision.

c. **Earthquake**. All buildings, structures, and the contents thereof, shall be insured against damage resulting from earthquake and related perils in an amount equal to at least the lesser of the full replacement value of the Facilities or the aggregate principal amount of Outstanding Bonds and Parity Debt then outstanding, subject to reasonable deductibles. The District shall acquire earthquake insurance unless the Office agrees in writing to waive earthquake insurance. The Office and the Trustee shall be loss payees on all policies maintained pursuant to this subdivision.

d. **Flood**. All buildings, structures, and the contents thereof, shall be insured against damage resulting from flood and rising water in an amount equal to at least the lesser of the full replacement value of the Facilities or the aggregate principal amount of Outstanding Bonds and Parity Debt then outstanding, subject to reasonable deductibles. The District shall acquire flood insurance unless the Office agrees in writing to waive flood insurance. The Office and the Trustee shall be loss payees on all policies maintained pursuant to this subdivision.

2. *Builders Risk*. During the course of any substantial addition, extension, alteration, or improvement to the Facilities, the District shall maintain or cause to be maintained builders risk insurance in the amount of the full completed value of such construction work, subject to reasonable deductibles per occurrence, covering all risk of physical loss or damage with such exclusions as are acceptable to the Office. The Office and the Trustee shall be loss payees on all policies maintained pursuant to this subsection.

3. *Boiler and Machinery Insurance*. The District shall maintain boiler and machinery insurance providing coverage against loss of property and liability for damage to persons or property from explosion of, or accident to, boilers, tanks, pipes, pressure vessels, engines, wheels, electrical machinery, or apparatus connected therewith or operating thereby in an amount not less than $1,000,000, subject to deductibles not exceeding $10,000 per occurrence. The policy form shall also include Joint Loss Endorsement.

4. *Commercial General Liability Insurance*. The District shall maintain Commercial General Liability Insurance for bodily injury and property damage in a form at least as broad as the most recent revision of the Commercial General Liability Policy adopted by the (ISO), including non-owned and hired automobile coverage, with limits no less than with $1,000,000 per occurrence and annual aggregate limits equal to $3,000,000.

-24-

5. *Automobile Insurance*. The District shall maintain insurance for vehicles owned, non-owned or hired by the District with at least a $1,000,000 per accident limit.

6. *Professional Liability*. The District shall maintain professional liability insurance with per occurrence and general aggregate limits equal to $10,000,000, subject to reasonable deductibles or self-insured retention, unless otherwise agreed to in writing by the Office.

7. *Fidelity Bonds*. The District shall maintain fidelity bonds or other insurance covering dishonesty, including computer fraud, covering all District officers and employees who collect or have custody of or access to revenues, receipts or income of the District, with limits equal to $5,000,000, unless otherwise agreed to in writing by the Office.

8. *Business Interruption*. The District shall maintain business interruption insurance covering actual losses to the District of gross operating earnings which result directly from the necessary interruption of business caused by damage to or destruction of any real or personal property constituting part of the Facilities from risks covered by the insurance required above under subsection 1. Property Insurance, less charges and expenses which do not necessarily continue during such interruption of business, for such period of time as may be required, with exercise of due diligence and dispatch, to reconstruct, repair or replace such damages or destroyed property, with limits equal to at least Maximum Aggregate Annual Debt Service.

9. *Extra Expense*. The District shall maintain extra expense insurance covering additional expenses for continuing operations or to resume normal business incurred by the District which result directly from damage to or destruction of any real or personal property constituting part of the Facilities from the risks covered by the insurance required above under subsection 1, Property Insurance, with limits equal to at least Maximum Aggregate Annual Debt Service.

10. *Directors and Officers*. The District shall maintain insurance to cover wrongful acts of the directors and officers, including entity coverage, to the extent available in a non-profit directors and officers policy form in an amount not less than $10,000,000, unless otherwise agreed to by the Office in writing.

B. <u>Risk Management Consultant</u>. The District shall employ a Risk Management Consultant to review the insurance requirements of the District from time to time (but not less frequently than once every twenty-four (24) months). If the Risk Management Consultant makes recommendations for the increase of any of the coverage required by Subsection A of this Section, the District shall increase such coverage in accordance with such recommendations, subject to a good faith determination of the Board that such recommendations, in whole or in part, are in the best interests of the District. Notwithstanding anything in this Section to the contrary, the District shall have the right, without the giving rise to an event of default under this Regulatory Agreement solely on such account,

1. with the prior written consent of the Office, to maintain insurance coverage below that required by Subsection A of this Section, provided further that the District shall furnish to the Trustee and the Office a Statement of the Risk Management Consultant or other evidence, satisfactory to the Office, that the insurance so provided affords the greatest amount of coverage available for the risk being insured against at rates which in the judgment of the Risk Management Consultant are reasonable in connection with reasonable and appropriate risk management, or

-25-

2. with the prior written consent of the Office, to adopt alternative risk management programs which the Board determines to be reasonable and which shall not have a material adverse impact on the District's reimbursement from third party payers, including, without limitation, to self-insure in whole or in part, to participate in programs of captive insurance companies, to participate with other health care institutions in mutual or other cooperative insurance or other risk management programs, to participate in state or federal insurance programs, to take advantage of state or federal laws now or hereafter in existence limiting medical and malpractice liability, or to establish or participate in other alternative risk management programs;

all as may be approved in writing as reasonable and appropriate risk management by the Risk Management Consultant. A copy of any such approval shall be furnished to the Trustee and the Office.

## SECTION XVI. WORKERS' COMPENSATION AND INSURANCE LAW

The District shall at all times comply with California's Workers' Compensation, Insurance and Safety Act, including the Workers' Compensation and Insurance law at Division 4 of the California Labor Code, or any successor statute or statutes, and shall maintain insurance or self-insurance for workers' compensation claims as required by Labor Code section 3700.

## SECTION XVII. INSURERS; POLICY FORMS AND LOSS PAYEES

The District shall obtain such insurance coverage as is required by this Regulatory Agreement only from insurers admitted to do business in the State by the Department of Insurance of the State, unless the Office gives its prior written consent. All policies shall name the District, the Office and the Trustee, as insured parties, beneficiaries or loss payees as their interest may appear. Each policy shall be in such form and contain such provisions as are generally considered standard for the type of insurance involved, subject to the specific requirements of Section XV above, and shall contain (a) a provision to the effect that the insurer shall not cancel or substantially modify the policy provisions without first giving at least thirty (30) days written notice thereof to the District, the Office, and the Trustee and (b) a severability of interests (cross liability) provision. Nothing herein shall preclude more than one coverage or class of insurance from being included in a single policy. The District shall file at least annually on or before July 1 of each year with the Trustee and the Office, a Statement setting forth the coverages maintained pursuant to this Regulatory Agreement, the names of the insurers and insured parties, the amounts of such insurance and applicable deductibles, the risks covered thereby and the expiration dates thereof and a similar description of any self-insurance or alternative risk management program adopted by the District, and stating whether the insurance described therein satisfies the requirements of this Regulatory Agreement. The Trustee shall be protected in relying upon such Statement without independent investigation into the matters covered therein. The District also shall file with the Trustee and the Office a copy of any insurance review or recommendations received by the District from the Risk Management Consultant pursuant to Section XV of this Regulatory Agreement.

## SECTION XVIII. TITLE INSURANCE

The District shall obtain, at its own cost and expense, an ALTA policy of title insurance, with such endorsements as may be required by the Office, at the time of and dated as of the date of delivery of the Bonds or Parity Debt, in an aggregate amount not less than the aggregate principal amount of the Bonds and Parity Debt to be outstanding after the issuance of such

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 29 of 57

Bonds or Parity Debt, payable to the Trustee and the Office, insuring the title of the District to the site of the Facilities, subject only to Permitted Encumbrances, issued by a title insurance company admitted to do business in the State by the Department of Insurance of the State, and which is acceptable to the Office.

### SECTION XIX. DISPOSITION OF INSURANCE AND CONDEMNATION PROCEEDS

A. The proceeds of property and builders risk insurance maintained by the District against loss or damage pursuant to subsections one and two of Section XV above, the proceeds of any title insurance obtained pursuant to Section XVIII and the proceeds of any condemnation awards with respect to the Facilities, shall be paid immediately upon receipt by the District or other named insured parties to the Trustee, for deposit in a special fund which the Trustee shall establish and maintain and hold in trust, to be known as the "Insurance and Condemnation Proceeds Fund." In the event the District elects to repair or replace the property damaged, destroyed or taken, it shall furnish to the Trustee and the Office plans of the contemplated repair or replacement, accompanied by a Statement of an architect or other qualified expert satisfactory to the Office estimating the reasonable cost of such repair or replacement and a Statement of the District stating that amounts in the Insurance and Condemnation Proceeds Fund, together with investment income reasonably expected to be received with respect thereto and any other funds available or reasonably expected to become available therefor (and which the District shall agree to deposit in said fund when so available), shall be sufficient to repair or replace the property damaged, destroyed or taken in accordance with said plans. After deducting therefrom the reasonable charges and expenses of the Trustee in connection with the collection and disbursement of such moneys, moneys in the Insurance and Condemnation Proceeds Fund shall be disbursed by the Trustee for the purpose of repairing or replacing the property damaged, destroyed or taken in the manner and subject to the conditions set forth in the Indenture with respect to disbursements from the Project Fund to the extent the provisions thereof may reasonably be made applicable. In the event that the proceeds of any loss or damage to or condemnation of the Facilities shall be less than one and one-half percent (1-1/2%) of the District's Adjusted Annual Operating Revenues (as shown on the District's most recent audited financial statements), and so long as an event of default under this Regulatory Agreement has not occurred and is not then continuing, the Trustee shall pay over such proceeds to the District without requiring any of the documents referred to in this Subsection and without any formality whatsoever.

B. In the event the District, with the consent of the Office, shall elect not to repair or replace the property damaged, destroyed or taken, as provided in Subsection A of this Section, the Trustee shall transfer all amounts in the Insurance and Condemnation Proceeds Fund on account of such damage, destruction or condemnation to the Special Redemption Account in order to prepay the Loan Repayments and redeem Bonds; provided that if any Parity Debt is then outstanding, any such transfer from the Insurance and Condemnation Proceeds Fund shall be deposited in part in the Special Redemption Account and in part in such other fund or account as may be appropriate (and used for the retirement of such Parity Debt) in the same proportion which the aggregate principal amount of Outstanding Bonds then bears to the aggregate unpaid principal amount of such Parity Debt.

C. If all amounts in the Insurance and Condemnation Proceeds Fund and any special redemption account for the retirement of Parity Debt exceed one and one-half percent (1-1/2%) of the District's Adjusted Annual Operating Revenues (as shown on the District's most recent audited financial statements) but are not sufficient to retire all Bonds and Parity Debt then outstanding, the Trustee shall not transfer said amounts to the Special Redemption Account unless the District shall file with the Trustee a report of a Management Consultant showing that projected Net Income Available for Debt Service will be sufficient to pay Aggregate Debt

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 30 of 57

Service for the three full Fiscal Years immediately following such transfer after giving effect to the retirement of such Bonds and Parity Debt. In the event such report of a Management Consultant shows that projected Net Income Available for Debt Service will not be sufficient to pay Aggregate Debt Service for the three full Fiscal Years immediately following such transfer after giving effect to the retirement of such Bonds and Parity Debt, the District shall apply all amounts in the Insurance and Condemnation Proceeds Fund to the repair or replacement of the property damaged, destroyed or taken, as provided in Subsection A of this Section, unless the District shall file a further report of a Management Consultant showing that even after making such repair and replacement, projected Net Income Available for Debt Service will not be sufficient to pay Aggregate Debt Service for the three Fiscal Years immediately following such repair and replacement, in which event the Trustee shall transfer all moneys in the Insurance and Condemnation Proceeds Fund to the Special Redemption Account and/or such other trust account for the retirement of Bonds and Parity Debt, as provided in Subsection B of this Section XIX.

## SECTION XX. OPERATION OF THE FACILITIES

A. <u>Income and Expenses from Other Businesses or Activities</u>. If the District has any business or activity other than the operation of the Facilities, it shall maintain accurate and complete accounting records which segregate all income and expenses of the Facilities from any other income and expenses of the District and from any other income and expenses of any other Person. Income and other funds of the District shall be expended only for the purposes of the District.

B. <u>Management of the Facilities</u>. The District shall provide for the management of the Facilities in a manner satisfactory to the Office.

1. So long as the District is not in default under this Regulatory Agreement, it may enter into a contract with a Management Agent, which is not an independent contractor, without the prior written consent of the Office, so long as such contract contains the following provisions regarding benefits or payments (including payments over time) to the Management Agent upon severance of employment:

ALL BENEFITS OR PAYMENTS RESULTING FROM TERMINATION OR SEVERANCE OF THE EMPLOYMENT PROVIDED FOR IN THIS CONTRACT, WHICH ARE, OR MAY BE, PAID AFTER THE TERMINATION OR SEVERANCE OF SUCH EMPLOYMENT, MAY BE VOIDED OR TERMINATED BY THE OFFICE OF STATEWIDE HEALTH PLANNING AND DEVELOPMENT (OFFICE) SHOULD THE EMPLOYER DEFAULT IN THE DUE AND PUNCTUAL PAYMENT OF ANY INSTALLMENT OF INTEREST, PRINCIPAL OR REDEMPTION PRICE, IF ANY, OF ANY BOND INSURED BY THE OFFICE. THE OFFICE MAY VOID OR TERMINATE ANY CONTRACT PROVISION PROVIDING FOR THE PAYMENT OF SUCH BENEFITS OR PAYMENTS IN ITS SOLE DISCRETION, WHETHER PRIOR TO, OR SUBSEQUENT TO SEVERANCE OF THE EMPLOYMENT PROVIDED FOR IN THIS CONTRACT.

2. The District shall not enter into any contract with a Management Agent which is an independent contractor without the prior written consent of the Office.

3. The District's present contract with the following Management Agent is hereby approved by the Office:

Raymond T. Hino, MPA, FACHE, Chief Executive Officer

-28-

4. If the District is in default under the terms and conditions of this Regulatory Agreement, it shall not enter into, or terminate any contract with a Management Agent without the prior written consent of the Office.

5. Any contract entered into by the District with a Management Agent, whether or not such Management Agent is an independent contractor, shall contain a provision that it shall be subject to termination, with or without cause and without penalty upon thirty (30) days' written notice of termination by the Office to the District and the Management Agent. Provided, however, that so long as the District is not in default under any obligation, term, or condition of this Regulatory Agreement to be performed by it, the Office will not exercise its right to replace such Management Agent without cause.

6. The District shall not enter into any contract with a Management Agent, whether or not such Management Agent is an independent contractor, which compensates the Management Agent on a basis of a percentage of revenue.

C. Examinations and Inspections by the Office. The Facilities, equipment, buildings, plans, office apparatus, devices, books, contracts, records (except for patient records, credentialling records and peer review records that are confidential pursuant to federal, State or local law), documents, and other papers relating thereto or to the District shall be subject to examination and inspection at any reasonable time by the Office or its duly authorized agents; the District shall keep copies of all written contracts or other instruments which affect the Facilities, all or any of which may be subject to inspection and examination by the Office or its duly authorized agents.

D. Maintain License. The District shall at all times, where required by the laws of the jurisdiction, maintain in full force and effect the applicable licenses to operate the Facilities from the State and/or other licensing authority. The District shall notify the Office if any such licensing authority makes any determination which may affect the licensing of the Facilities. The District shall at all times maintain in full force and effect all other governmental approvals, permits, qualifications and certificates necessary for the efficient functioning of the Facilities.

E. Equip the Facilities. The District shall, pursuant to applicable licensing regulations from time to time in effect, suitably equip the Facilities to facilitate its overall operations. The District shall perform all obligations of any chattel mortgage, conditional sale, lease or lease purchase agreement, or other type of financing arrangement designed to acquire equipment if failure to perform such obligations might have consequences that would materially and adversely affect the financial conditions, assets, properties or operations of the District.

F. Acquisition of Services, Supplies and Materials. The District shall make no payment from the Project Fund established under the Indenture for services, supplies or materials without the prior written consent of the Office and such services are rendered and such supplies and materials are delivered for the construction and acquisition of the Facilities and are reasonably necessary for their completion or operation.

G. Indebtedness on Default. During the continuance of a default under this Regulatory Agreement or an Event of Default under the Indenture, the District shall not incur any additional Indebtedness or make any additional capital acquisition without the prior written consent of the Office.

H. Lien on Future Acquired Real Property. If the District acquires any real property to be used or usable in connection with the operation of the Facilities while this Regulatory

-29-

Agreement is in effect, such acquired real property ("Acquired Property") shall be deemed to fall within the definition of Facilities and therefore shall be subject to this Regulatory Agreement. The District shall convey an interest (which need not give the Office a first lien position) in the Acquired Property for the benefit of the Office under the Deed of Trust, unless such requirement is waived in writing by the Office.

## SECTION XXI. REMEDIES UPON DEFAULT

A. Notice and Declaration of a Default under this Regulatory Agreement. Upon a violation of any of the provisions of this Regulatory Agreement by the District, the Office may give written notice thereof to the District by registered or certified mail, addressed to the address stated in this Regulatory Agreement, or such other address as may subsequently, upon appropriate written notice thereof to the Office, be designated by the District as its legal business address. If such violation is not corrected to the satisfaction of the Office within thirty (30) days, or in the event the default is the result of the failure of the District to make a payment required to be made to the Trustee or the result of the loss of or threatened loss of the license of the District, five (5) days after the date such notice is mailed or within such further time as the Office determines in the Office's sole discretion is necessary to correct the violation, without further notice the Office may declare a default under this Regulatory Agreement effective on the date of such declaration of default.

B. Office Directives to the District. Upon an event of default under this Regulatory Agreement, the Deed of Trust or the Indenture, the Office shall have the remedies provided by California Health and Safety Code section 129173 which are incorporated herein, as well as the following. The Office may conduct an evaluation of, and direct the District with respect to, the management and operation of the Facilities and the expenses of the Office or any consultants associated with such evaluation and direction shall be reimbursed by the District. The District shall follow all such directives, which may at the option of the Office include immediately terminating and replacing the existing Management Agent with a new Management Agent selected by the Office at the expense of the District. In the event of any such termination, the Management Agent shall not be entitled to compensation for more than thirty (30) days from the date of such termination. The Office may retain attorneys and consultants to assist in such evaluation and the District shall pay the reasonable fees and expenses of such attorneys and consultants and any other expenses incurred by the Office in that connection. These remedies are in addition to those provided under Insurance Law Section 129173. The Office reserves its rights to exercise all its remedies under Insurance Law Section 129173.

C. Payment from the Health Facility Construction Loan Insurance Fund.

1. In any case in which an Event of Default under the Indenture shall have occurred and the Trustee shall have given notice to the Office at least 30 days prior to an interest payment date, or principal payment date that:

a. available moneys in the Principal and Interest Accounts held by the Trustee pursuant to the Indenture will be insufficient to pay in full the next succeeding payment of interest and/or principal when due to the Owners under the Indenture, and

b. the amount by which the obligation to make such payment exceeds the amount available (Shortfall),

-30-

the Office shall cause an amount equal to the Shortfall to be deposited into the Principal Account and/or Interest Account at least three (3) Business Days prior to the date on which said payment is due, as provided in the following Subsections 2 and 3.

2. Said deposit shall be made by the Office directing the Trustee to transfer an amount equal to the Shortfall out of the Bond Reserve Account into the Principal Account and/or Interest Account. (However, if there are insufficient funds in the Bond Reserve Account at the time the Office receives such notice of the Shortfall from the Trustee, nothing contained in this Subsection C.2 shall prevent the Office from then determining pursuant to Insurance Law Section 129145 that the lender and borrower have exhausted all reasonable means of curing the Event of Default and that it would be in the best interest of the State, the borrower and the lender to pay a portion or all of the Shortfall from the Health Facility Construction Loan Insurance Fund instead of the Bond Reserve Account, and from paying such amount from the Health Facility Construction Loan Insurance Fund.)

3. If the Office, pursuant to Insurance Law Section 129145, determines, in the event the funds in the Bond Reserve Account are insufficient to meet the Shortfall as provided in the preceding Subsection C.2, that

    a. the lender and borrower will have exhausted all reasonable means of curing the Event of Default, and

    b. a payment or payments from the Health Facility Construction Loan Insurance Fund to cure the Event of Default is now and will be at the time of the Event of Default in the best interest of the State, the borrower and the lender,

the Office may pay such amount required to meet the Shortfall from the Health Facility Construction Loan Insurance Fund to the Principal Account and/or Interest Account for the benefit of the lender within the time as provided in Subsection C.1.

4. Any payment made by the Office from the Health Facility Construction Loan Insurance Fund (Fund) shall be secured pursuant to Insurance Law Section 129145 through the Deed of Trust and all applicable UCC-1s, and, upon such payment, the District shall become liable for repayment of the amount thereof to the Office upon demand and shall be liable for interest on the unpaid balance thereof at the rate of ten percent (10%) per annum.

5. If the principal of all Bonds at the time Outstanding, and the interest accrued thereon have been declared immediately due and payable pursuant to the terms of the Indenture, the Office shall make payment from the Fund, or, if the fund is insufficient to make such payment, or if the Office determines it to be in the best interest of the State, the District and the Office shall request issuance of debentures as provided in subsection D of this Section.

D. Issuance of Debentures.

    1. In any case in which

        a. the Office shall have directed the foreclosure and taking possession of the Facilities under the Deed of Trust and under applicable statutes,

        b. the Office, shall have otherwise acquired the Facilities from the District after default,

-31-

c. the Office shall have received a satisfactory conveyance of title and transfer of possession of the Facilities directly from the District, or other appropriate grantor, or

d. it has been determined that debentures should be issued pursuant to subsection C above,

the Trustee shall be entitled to receive the benefit of the insurance as provided in Insurance Law Sections 129125 through 129160, upon

a. the prompt conveyance to the Office of title to the Facilities or, with the consent of the Office, the security interest created by the Deed of Trust,

b. the assignment to the Office of all claims of the Trustee against the Corporation or others arising out of the sale of the Bonds, the loan transaction or the foreclosure proceedings, except such claims as may have been released with the consent of the Office, and

c. surrender to the Office of each Bond which has been surrendered to the Trustee, which Bond shall be returned to the Trustee upon issuance of debentures and canceled by the Trustee.

2. Upon such assignment and surrender, the Office shall request the State Treasurer to issue to the Trustee for the benefit of the Owners so surrendered, a debenture or debentures having a total face value of and bearing interest at the rate on the respective surrendered Bonds which they replace and additional debentures equal to all additional amounts due under the Indenture as provided by Insurance Law Sections 129125 through 129160.

E. Additional Remedies Available to the Office. Notwithstanding any other provision in this Regulatory Agreement or provision of law relating to the acquisition, management or disposal of real property by the State, the Office shall have the power to do any or all of the following:

1. Possess, operate, complete, lease, rent, renovate, modernize, insure, or sell for cash or credit, in its sole discretion, any properties conveyed to it in exchange for debentures as provided in the Insurance Law;

2. Pursue to final collection by way of compromise or otherwise all claims against the District assigned by the Trustee to the Office; or

3. Convey and execute in the name of the Office deeds of conveyance, deeds of release, assignments and satisfactions of the Deed of Trust, and any other written instrument relating to real or personal property or any interest therein acquired by the Office.

In the event a receiver is appointed for the District at the request of the Office, such receiver, if so requested by the Office, shall serve without bond.

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 35 of 57

## SECTION XXII. NO DISCRIMINATION

The District shall comply fully with the provisions of any applicable federal, state or local laws prohibiting discrimination in employment or housing on the basis of race, color, creed, sex or national origin. Upon failure or refusal to comply with such provision, the Office may take such corrective action as it may deem necessary to effect compliance, including, but not limited to, any remedy at law or in equity.

## SECTION XXIII. FINANCIAL STATEMENTS

A. The District shall deliver to the Office within thirty (30) days of the receipt by the District of its audited financial statements, and in any event within one hundred fifty (150) days after the end of each Fiscal Year, two copies of its audited financial statements as of the end of such year (including a balance sheet, a statement of revenues and expenses, a statement of changes in fund balances, a statement of changes in financial position and other financial reports and schedules as may have been delivered to the District in connection with such financial statements), together with (1) the report and opinion of an Accountant stating that the financial statements have been prepared in accordance with generally accepted accounting principles (with such exceptions as are not objected to by the Office) and that such Accountant's examination was performed in accordance with generally accepted accounting standards, and (2) a Certificate of the chief financial officer of the District stating that no event constitutes an Event of Default (as that term is defined in the Indenture) or which with the giving of notice or the passage of time or both would constitute an Event of Default has occurred and is continuing as of the end of such Fiscal Year, or specifying the nature of such event and the actions taken and proposed to be taken by the District to cure such default. The District also shall deliver to the Office within forty-five (45) days after the end of each quarter one copy of its quarterly unaudited financial statements, all prepared with reasonably due diligence, and satisfactory in scope to the Office. The District also shall deliver to the Office within thirty (30) days of receipt by the District, one copy of any management letter submitted to the District by an Accountant in connection with each annual or interim audit of accounts of the District made by such Accountant. The District shall also provide the Office with copies of all action letters prepared in response to any auditors' management letters.

B. The District shall prepare a preliminary budget not later than twenty (20) days prior to the close of its Fiscal Year in which the District shall set forth its estimated revenues and expenses anticipated for the ensuing Fiscal Year. The budget shall be approved by the governing bodies of the District not later than five (5) days before the close of the Fiscal Year. Within thirty (30) days after the approval of its budget by the governing boards of the District, the District shall deliver a copy of its approved budget to the Office.

C. If the District fails to provide audited financial statements to the Office as provided in this Section, the Office may, at the District's expense, cause an audit to be performed and audited financial statements to be prepared.

## SECTION XXIV. CAPITAL REPLACEMENT

A. The District shall certify to the Office, on an annual basis, that the District's Board of Directors has discussed current and projected funding requirements which would be necessary to appropriately maintain the District's physical plant and equipment. Such a certification shall be signed by the chief executive officer of the District and by the President of the District's Board of Directors and shall include:

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 36 of 57

1. the minutes of the meeting at which the discussion took place;

2. a capital replacement budget covering the ensuing five year period; and

3. a brief description of the source of funding for such a budget.

B. From time to time (but not less frequently than once every five years), the District shall perform or cause to be performed a formal inspection of its physical plant resulting in a written report by a qualified professional recommending maintenance and repairs necessary to appropriately maintain the physical plant and equipment. Such report must include a discussion as to the implementation of recommendations made in the prior report. Such report shall be provided to the District's Board of Directors and forwarded to the Office along with the certified report required in paragraph A above.

## SECTION XXV. DEBT COVERAGE RATIO REPORTING

Within forty-five (45) days after each March 31, June 30, September 30 and December 31, (each three-month period ending on each such date being referred to herein as a "Fiscal Quarter") commencing with the Fiscal Quarter ending on June 30, 2010, the District shall compute the Net Income Available for Debt Service for such Fiscal Quarter and for the twelve-month period ending on the last day of such Fiscal Quarter ("Running Twelve-Month Period") and promptly furnish to the Office a Statement setting forth the results of such computation. If at the end of such Fiscal Quarter the Net Income Available for Debt Service shall have been less than 1.25 times Maximum Aggregate Annual Debt Service for such Running Twelve-Month Period, the District shall, upon the request of the Office, employ a Management Consultant to make recommendations as to a revision of the rates, fees and charges of the Facilities or the methods of operation of the Facilities which will result in producing Net Income Available for Debt Service equal to at least 1.25 times Maximum Aggregate Annual Debt Service for such Fiscal Quarter. Copies of the recommendations of the Management Consultant shall be provided to the Office. The Office also may retain attorneys and consultants to assist in an evaluation of the operation and management of the Facilities and the District shall pay the reasonable fees and expenses of such attorneys and consultants and any expenses incurred by the Office in that connection.

## SECTION XXVI. ENVIRONMENTAL DISCLOSURE AND INSPECTION

A. The District shall exercise all due diligence in order to comply and cause all Persons on or occupying the Facilities to comply with all Environmental Laws.

B. The Office may, from time to time and in its reasonable discretion, retain, at the District's expense, an independent professional consultant to review any report relating to Hazardous Material prepared by or for the District and to conduct its own investigation of the Facilities. The District hereby grants to the Office, its agents, employees, consultants and contractors the right, upon reasonable notice and during reasonable hours, to enter into or onto the Facilities to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation.

C. The District shall promptly advise the Office in writing and in reasonable detail of

1. any Release of any Hazardous Material required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws,

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 37 of 57

2. any and all written communications with respect to Environmental Claims or any Release of Hazardous Material required to be reported to any federal, state or local governmental or regulatory agency,

3. any remedial action taken by the District or to the District's knowledge, by any other person in response to

a. any Hazardous Material on, under or about any Facilities, the existence of which could result in an Environmental Claim having a material adverse effect upon the business, operations, properties, assets, or condition (financial or otherwise) of the District, or

b. any Environmental Claim that could have a material adverse effect upon the business, operations, properties, assets, or condition (financial or otherwise) of the District,

4. the District's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Facilities that could cause the Facilities or any part thereof to be classified as "border-zone property" or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws, and

5. any request for information from any governmental agency that indicates such agency is investigating whether the District may be potentially responsible for a Release of Hazardous Materials.

D. The District shall promptly notify the Office of any proposed acquisition of stock, assets, or property by the District, that could reasonably be expected to expose the District to, or result in, Environmental Claims that could have a material adverse effect upon the business, operations, properties, assets, or condition (financial or otherwise) of the District, and any proposed action to be taken by the District to commence manufacturing, industrial or other operations not in the ordinary course of business as conducted prior to the date of recording of this Regulatory Agreement that could reasonably be expected to subject the District to additional laws, rules or regulations, including, without limitation, laws, rules and regulations requiring additional environmental permits or licenses.

E. The District shall execute, on the effective date of this Regulatory Agreement and from time to time as requested by the Office or the Trustee, Environmental Indemnities in the form attached hereto as Exhibit C.

SECTION XXVII. NOTICE OF DEFAULT

The District shall immediately give notice to the Office and the Trustee of any notice of default given by the holder of any indebtedness of the District.

SECTION XXVIII. CANCELLATION OF INSURANCE

No default by the District under this Regulatory Agreement or failure by the Trustee to enforce compliance by the District herewith shall result in cancellation of the insurance of the Bonds under the Insurance Law, except as provided in Insurance Law Sections 129175 to 129185 or the Contract of Insurance.

-35-

## SECTION XXIX. OFFICE CONSENT DISCRETIONARY

The District agrees that if provisions of this Regulatory Agreement, the Contract of Insurance or the Indenture require the consent of the Office as a condition to certain actions by the District, the Office shall conduct an independent evaluation of such actions as a basis for granting such consent and such consent need not be given despite compliance of the District with the other stated conditions to such actions, including compliance with projected or historical financial condition tests. Such consent shall be in the sound and reasonable discretion of the Office.

## SECTION XXX. CONTRARY AGREEMENTS SUPERSEDED

The District warrants that it has not executed, and will not execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Regulatory Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith except as may be set forth in the Contracts of Insurance.

## SECTION XXXI. SPECIFIC PERFORMANCE

The Office or the State (or, as to Sections VII and XIII through XIX of this Regulatory Agreement, the Trustee) may apply to any court for the specific performance of this Regulatory Agreement or the Contract of Insurance or for an injunction against any violation of this Regulatory Agreement or the Contract of Insurance or for such other relief as may be appropriate since the injury to the Office, the State or the Trustee, arising from a default under any of the terms of this Regulatory Agreement or the Contract of Insurance would be irreparable and the amount of damage would be difficult to ascertain.

## SECTION XXXII. WAIVER OF PERSONAL LIABILITY

No employee, officer or agent of the Office shall be individually or personally liable for any injury caused by their acts or omissions relating in any way whatsoever to the transaction resulting in this Regulatory Agreement and the Contract of Insurance. The District hereby releases each and every employee, officer and agent of the Office of and from any personal or individual liability for negligence under this Regulatory Agreement or the Contract of Insurance.

The employees and officers of the Office shall not be liable for any of their acts hereunder except as provided by California statutes concerning the liability of State employees and officers.

## SECTION XXXIII. NOTICES

All notices, requests or communications required or permitted to be given in this Regulatory Agreement or in the Contract of Insurance shall be in writing and mailed or delivered to the party whom notice is to be given either (i) by personal delivery (in which case such notice shall be deemed to have been duly given on the date of delivery if delivered before 4:00 p.m., and if after 4:00 p.m., it shall be deemed to have been duly given on the next business

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 39 of 57

day after delivery of the notice), (ii) by Federal Express or other similar air courier service (in which case notice shall be deemed to have been duly given on the next business day after delivery of the notice to the air courier service), or (iii) by United States mail, first class, postage prepaid, registered or certified (in which case such notice shall be deemed to have been duly given on the third (3rd) business day following the date of mailing), and properly addressed as follows:

| | |
|---|---|
| Office: | Office of Statewide Health Planning and Development<br>400 R Street, Room 470<br>Sacramento, CA 95811<br>Attention:  Deputy Director<br>  Cal-Mortgage Loan Insurance Division |
| District: | Mendocino Coast Health Care District<br>700 River Drive<br>Fort Bragg, CA 95437<br>Attention: Chief Executive Officer |
| Trustee: | The Bank of New York Mellon Trust Company, N.A.<br>550 Kearny Street, Suite 600<br>San Francisco, CA 94108<br>Attention: Corporate Trust Department |

A duplicate copy of each notice or communication given hereunder by either the Office or the District to the other shall also be given to the Trustee. The District, the Office and the Trustee may, by notice given hereunder, designate any further or different address to which subsequent notices, Statements and other communications shall be sent.

## SECTION XXXIV. SUCCESSORS BOUND

This Regulatory Agreement shall bind, and the benefits shall inure to, the respective parties hereto, their legal representatives, successors in office or interest, and assigns (other than the Trustee) as owners or operators of the Facilities, so long as the Contract of Insurance continues in effect, and if the Trustee receives the benefit of the Insurance, so long as the Office holds a security interest under the Deed of Trust.

## SECTION XXXV. SEVERABILITY OF INVALID PROVISIONS

The invalidity of any clause, part, or provision of this Regulatory Agreement shall not affect the validity of the remaining portions hereof so long as the insurance remains in effect.

## SECTION XXXVI. AGREEMENT REPRESENTS COMPLETE AGREEMENT; AMENDMENTS

Except as otherwise provided herein, this Regulatory Agreement represents the entire contract among the parties. This Regulatory Agreement may be amended, changed, modified or terminated by the written agreement of the Office and the District.

## SECTION XXXVII. HEADINGS AND REFERENCES

The headings or titles of the Sections hereof, and any table of contents hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or affect of

-37-

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 40 of 57

this Regulatory Agreement. All references herein to "Sections," "Subsections" and other subdivisions are to the corresponding Sections, Subsections or subdivisions of this Regulatory Agreement; the words "herein," "hereof," "hereby," "hereunder" and other words of similar import refer to this Regulatory Agreement as a whole and not to any particular Section, Subsection or subdivision hereof; and words of the masculine gender shall mean and include words of the feminine and neuter genders.

## SECTION XXXVIII. GOVERNING LAW; VENUE

The laws of the State shall govern this Regulatory Agreement, the interpretation thereof and any right or liability arising hereunder. Any action or proceeding to enforce or interpret any provision of this Regulatory Agreement shall be brought, commenced or prosecuted in Sacramento County, California.

## SECTION XXXIX. ATTORNEYS' FEES

In the event of any action at law or in equity between the parties hereto to interpret or enforce any of the provisions of this Regulatory Agreement, the nonprevailing party or parties to such litigation shall pay to the prevailing party or parties all costs and expenses, including actual attorneys' fees, incurred therein by such prevailing party or parties; and if such prevailing party or parties shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees may be included in and as part of such judgment. The prevailing party shall be the party who is entitled to recover its costs of suit, whether or not the suit proceeds to final judgment. A party not entitled to recover its costs of suit shall not recover attorneys' fees.

-38-

## SECTION XL. EXECUTION IN COUNTERPARTS

This Regulatory Agreement may be executed in any number of counterparts, each of which shall be deemed for all purposes to be an original and all of which together shall constitute but one and the same instrument.

MENDOCINO COAST HEALTH CARE DISTRICT

By _____

Raymond T. Hino, MPA, FACHE
Chief Executive Officer

OFFICE OF STATEWIDE HEALTH PLANNING AND DEVELOPMENT OF THE STATE OF CALIFORNIA

By: David M. Carlisle, M.D., Ph.D., Director

By _____

Carl A. McLaney,
Deputy Director

-39-

## SECTION XL. <u>EXECUTION IN COUNTERPARTS</u>

This Regulatory Agreement may be executed in any number of counterparts, each of which shall be deemed for all purposes to be an original and all of which together shall constitute but one and the same instrument.

MENDOCINO COAST HEALTH CARE
DISTRICT

By _____

　　Raymond T. Hino, MPA, FACHE
　　Chief Executive Officer

OFFICE OF STATEWIDE HEALTH
PLANNING AND DEVELOPMENT OF THE
STATE OF CALIFORNIA

By: David M. Carlisle, M.D., Ph.D., Director

By _____

　　Carl A. McLaney,
　　Deputy Director

-39-

# NOTARY ACKNOWLEDGMENT

State of California

County of _____MENDOCINO_____ } ss.

On __July 1, 2010__, before me, __Carla A. Winkler, Notary Public,__
<br>Date
<br>Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _____RAYMOND T. HINO_____
<br>Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CARLA A. WINKLER
Commission # 1770446
Notary Public - California
Mendocino County
My Comm. Expires Sep 25, 2011

Place Notary Seal Above

_____
<br>Signature of Notary Public

━━━━━━━━━━ **OPTIONAL** ━━━━━━━━━━

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____REGULATORY AGREEMENT_____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**

Signer's Name: _____

☐ Individual
☐ Corporate Officer -- Title(s): _____
☐ Partner -- ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

State of California

County of _Sacramento_

On _July 1, 2010_ before me, _Stanley Price Notary Public_
    Date                    Here Insert Name and Title of the Officer

personally appeared _Carl A. McLaney_
                          Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

**STANLEY PRICE**
Commission # 1740936
Notary Public - California
Sacramento County
My Comm. Expires Apr 22, 2011

Place Notary Seal Above

Signature: _Stanley Price_
                      Signature of Notary Public

---

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _Regulatory Agreement_

Document Date: _____ Number of Pages: _39_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _Carl A. McLaney_
- ☐ Corporate Officer — Title(s): _____
- ☐ Individual
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☒ Other: _Deputy Director_

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____
_OSHPD_

Signer's Name: _____
- ☐ Corporate Officer — Title(s): _____
- ☐ Individual
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)     Item #5907

# EXHIBIT A

# REAL PROPERTY DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF FORT BRAGG, COUNTY OF MENDOCINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcel One:

All that portion of the following described property that lies within Lot 75 of the Suburban Lots South of Fort Bragg and a 30' strip on the South as delineated upon that Record of Survey Map filed in Map Case 2, Drawer 8, Page 23, Mendocino County Records, and being a portion of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian, more particularly described as follows:

Beginning at a 5/8 inch diameter iron pin tagged L.S. 1880 marking the Northwest corner of Parcel 4 as said parcel appears on that survey filed for record in Map Case 2, Drawer 21, Page 100, Mendocino County Records; thence from said point of beginning around the exterior boundaries of this property to wit: North 88° 40' 20" West, 322.47 feet; thence North 01° 25' 35" East, 327.00 feet; thence South 88° 40' 20" East, 321.80 feet; thence South 01° 19' 40" West, 327.00 feet to the point of beginning.

Bearings used in this description are in terms of the California State Grid, Zone II.

APN: 18-090-02

Parcel Two:

All that certain real property situated in the City of Fort Bragg, County of Mendocino, State of California, and being a portion of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian, and being any and all lands and all interest thereto lying within the following described real property:

This description if given pursuant to City of Fort Bragg Lot Line Adjustment LLA 1-04, and the intent of the adjustment is to reconfigure two existing lots and not to create additional lots.

Beginning at the Northeast corner of Union Lumber Company Suburban Lot 76, as said corner is shown and delineated upon that certain Record of Survey Map filed for record on February 28, 1967 in Map Case 2, Drawer 8, Page 23, Mendocino County Records, said point of beginning can be further described as being North, 640.35 feet and East, 1793.03 feet from the 2 inch diameter iron bolt with brass plate at the Southwest corner of Section 7, Township 18 North, Range 17 West, Mount Diablo Meridian; thence from said point of beginning and along the exterior boundary lines of the parcel of land to be described as follows:

South 01° 19' 40" West, along the Easterly boundary line of said Suburban Lot 76, a distance of 640.00 feet to the Southeasterly corner thereof, thence North 88° 40' 20" West, along the Southerly boundary line of said Suburban Lot 76, a distance of 320.00 feet to the Southwest corner thereof; thence along the Westerly line of Suburban Lot 76, North 01° 19' 40" East, 313.82 feet and East, 1793.03 feet from the Southwest corner of Section 7, Township 18 North, Range 17 West, Mount Diablo Meridian; thence leaving said Westerly line, South 88° 40' 20" East, 249.00 feet; thence North 01° 19' 40" East, 172.33 feet to a point on the Southerly line of the lands of Lipsett, as shown on said Record of Survey Map; thence along said Southerly line of said lands, South 88° 40' 20" East, 11.00 feet to the Southeast corner of said lands of Lipsett; thence along the Easterly line of said lands, North 01° 19' 40" East, 153.85 feet to the Northeast corner of said lands of Lipsett and being on the Northerly line of said Suburban Lot 76; thence along said Northerly line, South 88° 40' 20" East, 60.00 feet to the point of beginning.

EXCEPTING therefrom that portion thereof conveyed in the deed to the City of Fort Bragg, recorded June 25, 1986 in Book 1566 Page 30.

APN: 018-090-16

Exhibit A
Page 1

<u>Parcel Three:</u>

A portion of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian, situate in the City of Fort Bragg and lying within the following described boundaries:

All bearings used in this description are in terms of the California State Grid, Zone 2.

Beginning at the northeast corner of Union Lumber Company Suburban Lot 76, as said corner is shown and delineated upon that certain Record of Survey map filed February 28, 1967 in Map Case 2, Drawer 8, Page 23, Mendocino County Records, said point of beginning can be further described as being North, 640.35 feet and East, 1703.07 feet from the 2 inch diameter iron bolt with brass plate at the southwest corner of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian; thence from said of beginning and along the exterior boundary lines of the parcel of land to be described as follows:

South 1° 19' 40" West, along the Easterly boundary line of said Suburban Lot 76, a distance of 640.00 feet to the Southeasterly corner thereof; thence South 88° 40' 20" East along the Southerly boundary lines of Suburban Lots 66 and 67 a distance of 640.59 feet; thence leaving said lot line, North 1° 19' 40" East, 680.00 feet; thence North 88° 40' 20" West 640.59 feet; thence South 1° 19' 40" West, 40.00 feet to the point of beginning.

APN: 018-090-15

# EXHIBIT B

## PERSONAL PROPERTY DESCRIPTION

All equipment used by the District in connection with the operation of the Facilities, whether moveable or not or hereafter affixed to the real property described in Exhibit A, now owned or hereafter acquired by the District, together with all improvements, restorations, replacements, repairs, additions, accessions or substitutions thereto or therefor, including, without limitation, all machinery, equipment, material, furnishings and appliances for generation or distribution of air, water, heat, electricity, light, fuel or refrigeration, for purposes of ventilation, sanitation or drainage, for exclusion of vermin or insects, for removal or disposal of dust, refuse or garbage; all elevators, awnings, window coverings, floor covering, laundry equipment, kitchen equipment, cabinets, furniture and furnishings; all fixed and moveable equipment now or hereafter installed or placed on said premises for use in health care, treatment, diagnosis and services or for other health care uses; the products and proceeds from any and all such property; all the estate, interest, right, title, property or other claim or demand of every nature whatsoever, in and to such property, including specifically, but without limitation, all deposits made with or other security given to utility companies by the District with respect to such property and claims or demands relating to insurance or condemnation awards which the District now has or may hereafter acquire.

Exhibit B

# EXHIBIT C

# ENVIRONMENTAL INDEMNITY

This ENVIRONMENTAL INDEMNITY ("Indemnity") is entered into as of July 1, 2010, by MENDOCINO COAST HEALTH CARE DISTRICT, a political subdivision of the State of California ("Indemnitor"), for the benefit of the Office of Statewide Health Planning and Development of the State of California ("Office"), and its successors and assigns, and the directors, officers, agents, attorneys, and employees (each of which shall be referred to hereinafter individually as an "Indemnitee" and collectively as the "Indemnitees").

## RECITALS

A. The Office and the Indemnitor have entered into a Contract of Insurance of even date herewith ("Contract of Insurance") and a Regulatory Agreement of even date herewith ("Regulatory Agreement"). The obligations of the Indemnitor arising out of the Contract of Insurance and the Regulatory Agreement are to be secured by, among other things, that certain Deed of Trust of even date herewith executed by the Indemnitor as trustor, to Chicago Title Insurance Company, as trustee, in favor of the Office, as beneficiary ("Deed of Trust"), which Deed of Trust encumbers the real property described on Exhibit A attached hereto ("Premises"), a copy of which is attached hereto, and the improvements constructed or to be constructed thereon (which improvements, together with the Premises, shall hereinafter be referred to as "Project").

B. As a result of the exercise of the Office's rights and remedies under the Regulatory Agreement, an Indemnitee may hereafter become the owner of the Project pursuant to a foreclosure sale or deed in lieu thereof. In such event, one or more of the Indemnitees may thereafter incur or suffer certain liabilities, costs, and expenses in connection with the Project relating to Hazardous Materials (as defined in the Regulatory Agreement). The Office has therefore made it a condition of the Office's entering into the Contract of Insurance that this Indemnity be executed and delivered by the Indemnitor in order to protect the Indemnitees from any such liabilities, costs, and expenses and all other Post-Foreclosure Transfer Environmental Losses (as hereinafter defined).

## AGREEMENT

In consideration of the foregoing and of the Office executing and delivering the Contract of Insurance, and other valuable consideration, the receipt of which is hereby acknowledged, the Indemnitor agrees as follows.

SECTION 1. Unless the context clearly otherwise requires, all capitalized terms not defined below and used in this Indemnity shall have the meanings assigned to such terms in the Regulatory Agreement:

a. *"Foreclosure Transfer"* means the transfer of title to all or any part of the Premises or the Project at a foreclosure sale under the Deed of Trust, either pursuant to judicial decree or the power of sale contained in the Deed of Trust, or by deed in lieu of such foreclosure.

b. *"Losses"* means any and all losses, liabilities, damages, demands, claims, actions, judgments, causes of action, assessments, penalties, costs and expenses (including, without limitation, the reasonable fees and disbursements of outside legal counsel and accountants and the reasonable charges of in-house legal counsel and accountants), and all foreseeable and unforeseeable consequential damages.

c. *"Post-Foreclosure Transfer Environmental Losses"* means Losses suffered or incurred, following a Foreclosure Transfer, by any Indemnitee, arising out of or as a result of:

(1) the occurrence, prior to a Foreclosure Transfer, of any Hazardous Material Activity;

(2) any violation, prior to such Foreclosure Transfer, of any applicable Environmental Laws relating to the Premises or the Project or to the ownership, use, occupancy or operation thereof;

Exhibit C
Page 1

Case: 13-01026   Doc# 1-10   Filed: 02/19/13   Entered: 02/19/13 16:49:06   Page 49 of 57

(3) any investigation, inquiry, order, hearing, action, or other proceeding by or before any governmental agency in connection with any Hazardous Material Activity occurring or allegedly occurring prior to a Foreclosure Transfer; or

(4) any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against any Indemnitee which directly or indirectly relates to, arises from or is based on any of the matters described in Subsections (1), (2), or (3), or any allegation of any such matters.

SECTION 2. The Indemnitor shall, to the extent permitted by law, indemnify, defend, and hold harmless Indemnitees, and each of them, from and against any and all Post-Foreclosure Transfer Environmental Losses.

SECTION 3. The Indemnitor shall not have any liability hereunder prior to a Foreclosure Transfer, and no claim may be made hereunder by any Indemnitee prior thereto. This Indemnity is given solely to protect the Office and the other Indemnitees against Post-Foreclosure Transfer Environmental Losses, and not as additional security for, or as a means of repayment of, the Indemnitor's obligations under the Regulatory Agreement. The obligations of the Indemnitor under this Indemnity are independent of, and shall not be measured or affected by:

a. any amounts at any time paid with respect to the Contract of Insurance or owing with respect to the Contract of Insurance, the Regulatory Agreement and/or the Deed of Trust, or secured by the Deed of Trust,

b. the sufficiency or insufficiency of any collateral (including, without limitation, the Project) given to the Office to secure repayment of any amounts owing with respect to the Contract of Insurance, the Regulatory Agreement and/or the Deed of Trust,

c. the consideration given by the Office or any other party in order to acquire the Premises or the Project, or any portion thereof,

d. the modification, expiration or termination of the Contract of Insurance, the Regulatory Agreement or any other document or instrument relating thereto, or

e. the discharge or repayment in full of amounts owing with respect to the Contract of Insurance, the Regulatory Agreement and/or the Deed of Trust (including, without limitation, by amounts paid or credit bid at a foreclosure sale or by discharge in connection with a deed in lieu of foreclosure).

Notwithstanding the provisions of any document or instrument, none of the obligations of the Indemnitor hereunder shall be in any way secured by the lien of the Deed of Trust or any other document or instrument securing the obligations under the Regulatory Agreement.

SECTION 4. The Indemnitor's obligations hereunder shall survive the sale or other transfer of the Premises or the Project prior to a Foreclosure Transfer. The rights of each Indemnitee under this Indemnity shall be in addition to any other rights and remedies of such Indemnitee against the Indemnitor under any other document or instrument now or hereafter executed by the Indemnitor, or at law or in equity (including, without limitation, any right of reimbursement or contribution pursuant to CERCLA, as defined in the Regulatory Agreement), and shall not in any way be deemed a waiver of any of such rights.

SECTION 5. All obligations of the Indemnitor hereunder shall be payable upon written demand to the Indemnitor by any Indemnitee. Such written demand shall be accompanied by a statement explaining the Post-Foreclosure Transfer Losses claimed and shall set forth the amounts demanded therefor. Any amount due and payable hereunder to any Indemnitee by the Indemnitor which is not paid within thirty (30) days after the receipt by the Indemnitor of such written demand from an Indemnitee shall bear interest from the date of such demand at ten percent; *provided, however*, an Indemnitee shall not be entitled to any such interest if the Indemnitor:

a. contests said obligations, and

Exhibit C
Page 2

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 50 of 57

b. prevails in said contest action.

SECTION 6. The Indemnitor shall pay to each Indemnitee all costs and expenses (including, without limitation, the reasonable fees and disbursements of any Indemnitee's outside legal counsel and the reasonable charges of any Indemnitee's in-house legal counsel) incurred by such Indemnitee in connection with this Indemnity or the enforcement hereof.

SECTION 7. This Indemnity shall be binding upon the Indemnitor, its heirs, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by each Indemnitee, its successors, endorsees and assigns. As used herein, the singular shall include the plural and the masculine shall include the feminine and neuter and vice versa, if the context so requires. If this Indemnity is executed by more than one person or entity, the liability of the undersigned hereunder shall be joint and several.

SECTION 8. This Indemnity shall be governed and construed in accordance with the laws of the State of California. Any action or proceeding to enforce or interpret any provision of this Indemnity shall be brought, commenced or prosecuted in Sacramento County, California.

SECTION 9. Every provision of this Indemnity is intended to be severable. If any provision of this Indemnity or the application of any provision hereof to any party or circumstance is declared to be illegal, invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction, such invalidity shall not affect the balance of the terms and provisions hereof or the application of the provision in question to any other party or circumstance, all of which shall continue in full force and effect.

SECTION 10. No failure or delay on the part of any Indemnitee to exercise any power, right or privilege under this Indemnity shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. No provision of this Indemnity may be changed, waived, discharged or terminated except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

IN WITNESS WHEREOF, this indemnity is executed as of the day and year first written above.

MENDOCINO COAST HEALTH CARE DISTRICT

By _____
Raymond T. Hino, MPA, FACHE
Chief Executive Officer

Exhibit C
Page 3

**EXHIBIT A TO EXHIBIT C**

**DESCRIPTION OF THE PREMISES**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF FORT BRAGG, COUNTY OF MENDOCINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcel One:

All that portion of the following described property that lies within Lot 75 of the Suburban Lots South of Fort Bragg and a 30' strip on the South as delineated upon that Record of Survey Map filed in Map Case 2, Drawer 8, Page 23, Mendocino County Records, and being a portion of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian, more particularly described as follows:

Beginning at a 5/8 inch diameter iron pin tagged L.S. 1880 marking the Northwest corner of Parcel 4 as said parcel appears on that survey filed for record in Map Case 2, Drawer 21, Page 100, Mendocino County Records; thence from said point of beginning around the exterior boundaries of this property to wit: North 88° 40' 20" West, 322.47 feet; thence North 01° 25' 35" East, 327.00 feet; thence South 88° 40' 20" East, 321.80 feet; thence South 01° 19' 40" West, 327.00 feet to the point of beginning.

Bearings used in this description are in terms of the California State Grid, Zone II.

APN: 18-090-02

Parcel Two:

All that certain real property situated in the City of Fort Bragg, County of Mendocino, State of California, and being a portion of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian, and being any and all lands and all interest thereto lying within the following described real property:

This description if given pursuant to City of Fort Bragg Lot Line Adjustment LLA 1-04, and the intent of the adjustment is to reconfigure two existing lots and not to create additional lots.

Beginning at the Northeast corner of Union Lumber Company Suburban Lot 76, as said corner is shown and delineated upon that certain Record of Survey Map filed for record on February 28, 1967 in Map Case 2, Drawer 8, Page 23, Mendocino County Records, said point of beginning can be further described as being North, 640.35 feet and East, 1793.03 feet from the 2 inch diameter iron bolt with brass plate at the Southwest corner of Section 7, Township 18 North, Range 17 West, Mount Diablo Meridian; thence from said point of beginning and along the exterior boundary lines of the parcel of land to be described as follows:

South 01° 19' 40" West, along the Easterly boundary line of said Suburban Lot 76, a distance of 640.00 feet to the Southeasterly corner thereof, thence North 88° 40' 20" West, along the Southerly boundary line of said Suburban Lot 76, a distance of 320.00 feet to the Southwest corner thereof; thence along the Westerly line of Suburban Lot 76, North 01° 19' 40" East, 313.82 feet; thence leaving said Westerly line, South 88° 40' 20" East, 249.00 feet; thence North 01° 19' 40" East, 172.33 feet to a point on the Southerly line of the lands of Lipsett, as shown on said Record of Survey Map; thence along said Southerly line of said lands, South 88° 40' 20" East, 11.00 feet to the Southeast corner of said lands of Lipsett; thence along the Easterly line of said lands, North 01° 19' 40" East, 153.85 feet to the Northeast corner of said lands of Lipsett and being on the Northerly line of said Suburban Lot 76; thence along said Northerly line, South 88° 40' 20" East, 60.00 feet to the point of beginning.

EXCEPTING therefrom that portion thereof conveyed in the deed to the City of Fort Bragg, recorded June 25, 1986 in Book 1566 Page 30.

APN: 018-090-16

Exhibit C
Page 4

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 52
of 57

Parcel Three:

A portion of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian, situate in the City of Fort Bragg and lying within the following described boundaries:

All bearings used in this description are in terms of the California State Grid, Zone 2.

Beginning at the northeast corner of Union Lumber Company Suburban Lot 76, as said corner is shown and delineated upon that certain Record of Survey map filed February 28, 1967 in Map Case 2, Drawer 8, Page 23, Mendocino County Records, said point of beginning can be further described as being North, 640.35 feet and East, 1703.07 feet from the 2 inch diameter iron bolt with brass plate at the southwest corner of Section 7, Township 18 North, Range 17 West, Mount Diablo Base and Meridian; thence from said of beginning and along the exterior boundary lines of the parcel of land to be described as follows:

South 1° 19' 40" West, along the Easterly boundary line of said Suburban Lot 76, a distance of 640.00 feet to the Southeasterly corner thereof; thence South 88° 40' 20" East along the Southerly boundary lines of Suburban Lots 66 and 67 a distance of 640.59 feet; thence leaving said lot line, North 1° 19' 40" East, 680.00 feet; thence North 88° 40' 20" West 640.59 feet; thence South 1° 19' 40" West, 40.00 feet to the point of beginning.

APN: 018-090-15

# EXHIBIT D

## EXISTING LIENS AND ENCUMBRANCES

All liens and encumbrances shown as exceptions to the title insurance policy delivered in connection with the issuance of the Bonds.

# EXHIBIT E

## COLLATERAL PLEDGED

All right, title and interest that the District, now has or may hereafter acquire in:

(i) All buildings, structures, improvements, fixtures, equipment and appurtenances now and hereafter owned, constructed, located, erected, installed or affixed by or on behalf of the District upon or appurtenant to the Land as described in Exhibit A of this Regulatory Agreement and all replacements and substitutions therefor ("Facilities");

(ii) All appurtenances, improvements, easements, pipes, transmission lines or wires and other rights used in connection with said Land or as a means of access thereto, whether now or hereafter owned or constructed or placed upon or in the Land or Facilities ("Appurtenances");

(iii) All equipment used by the District in connection with the operation of the Facilities, whether moveable or not or hereafter affixed to the Land, now owned or hereafter acquired by the District, together with all improvements, restorations, replacements, repairs, additions, accessions or substitutions thereto or therefor, including, without limitation, all machinery, equipment, material, furnishings and appliances for generation or distribution of air, water, heat, electricity, light, fuel or refrigeration, for purposes of ventilation, sanitation or drainage, for exclusion of vermin or insects, for removal or disposal of dust, refuse or garbage; all elevators, awnings, window coverings, floor covering, laundry equipment, kitchen equipment, cabinets, furniture and furnishings; all fixed and moveable equipment now or hereafter installed or placed on said premises for use in health care, treatment, diagnosis and services or for other health care uses; the products and proceeds from any and all such property; all the estate, interest, right, title, property or other claim or demand of every nature whatsoever, in and to such property, including specifically, but without limitation, all deposits made with or other security given to utility companies by the District with respect to such property and claims or demands relating to insurance or condemnation awards which the District now have or may hereafter acquire. (Equipment);

(iv) All leases or subleases with respect to the Land, Facilities, Appurtenances and Equipment ("Leases");

(v) All rentals or other payments which may now or hereafter accrue or otherwise become payable under the Leases to or for the benefit of the District together with all other income, rents, revenues, issues, profits, reserves, and royalties produced by the Land, Facilities, Appurtenances and Equipment or by all management or service contracts or other contracts affecting the Property, including but not limited to security deposits (collectively the "Rents");

(vi) All earnings, products, damages, indemnifications, insurance proceeds and any other proceeds from any and all of such Land, Facilities, Appurtenances, Equipment, Leases, Rents and Accounts including specifically, but without limitation, all deposits made with or other security given to utility companies and claims or demands relating to insurance or condemnation awards which the District now has or may hereafter acquire, including all advance payments of insurance premiums made by the District with respect thereto (Proceeds);

(vii) All accounts, accounts receivable and other rights to payment of money now owned or hereafter acquired by the District, whether due or to become due and whether or not earned by performance ("Accounts"), including without limitation the following:

(a) A right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a secondary obligation incurred or to be incurred, (iv) arising out of the use of a credit or charge card or information contained on or for use with the card;

(b) Any and all Accounts arising from any source, including without limitation operations of the District or its agents at the Facilities, and at any other health facility or office; and

Exhibit E
Page 1

(c) Any and all Accounts accruing from in-patient, out-patient, day treatment, and any other programs run by and operations of the District or its agents.

For purposes hereof, "Accounts" covered hereby shall include without limitation accounts, chattel paper, deposit accounts and instruments as defined by the California Commercial Code, health care insurance receivables. and any amounts receivable from third party payors (including insurance companies, Medicare and Medicaid, including without limitation any Medicare and/or Medi-Cal losses paid on recapture, unless otherwise prohibited by law), and excluding any donor restricted gifts, grants, bequests, donations, contributions or tax revenue in connection with the foregoing;

(viii) All right, title and interest of the District in all the District's inventory, raw materials, work in process, finished goods and goods held for sale or lease or furnished under contracts of service, and all returned and repossessed goods, and all goods covered by documents of title, including warehouse receipts, bills of lading and all other documents of every type covering all or any part of the Property, now owned or hereafter acquired, whether held by the District or any third party, which is located on, appurtenant to, relating to, or used by or useful in connection with the Property (Inventory);

(ix) "Gross Revenues" of the Debtor, which means all revenues, income, receipts and money received in any period by the Debtor (other than donor-restricted gifts, grants, bequests, donations, contributions and tax revenues), including, but without limiting the generality of the foregoing, the following:

(a) gross revenues derived from its operation and possession of and pertaining to its properties;

(b) proceeds with respect to, arising from, or relating to its properties and derived from (1) insurance (including business interruption insurance) or condemnation proceeds (except to the extent such proceeds are required by the terms of this Regulatory Agreement or other agreements with respect to the Indebtedness which the Debtor is permitted to incur pursuant to the terms of this Regulatory Agreement) to be used for purposes inconsistent with their use for the payment of Installment Payments, Supplemental Payments or similar payments with respect to Parity Debt, (2) accounts, including, but not limited to, accounts receivable, (3) securities and other investments, (4) inventory and intangible property, (5) payment/reimbursement programs and agreements, and (6) contract rights, accounts, instruments, claims for the payment of moneys and other rights and assets now or hereafter owned, held or possessed by or on behalf of the Debtor, and

(c) rentals received from the lease of the Debtor's properties or space in its facilities.

including, but not limited to, future interest on any and all revenues or incomes of any nature or kind which accrue to the District.

(x) All personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software. (General intangibles)

(xi) A negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment. The term does not include (i) investment property, (ii) letters of credit, or (iii) writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card. (Instrument)

(xii) Any record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. In this paragraph, "monetary obligation" means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation

with respect to software used in the goods. The term does not include (i) charters or other contracts involving the use or hire of a vessel or (ii) records that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card. If a transaction is evidenced by records that include an instrument or series of instruments, the group of records taken together constitutes chattel paper. (Chattel Paper)

Case: 13-01026    Doc# 1-10    Filed: 02/19/13    Entered: 02/19/13 16:49:06    Page 57
of 57